TRANSAMERICA INSURANCE COMPANY et al,
*Respondents—Cross-Appellants,*

*v.*

UNITED STATES NATIONAL BANK OF
OREGON, *Appellant—Cross-Respondent.*

(No. 72 4545, SC 23939)

558 P2d 328

[ 946 ]

*William M. McAllister,* Portland, argued the cause for appellant. With him on the briefs were Richard M.

Botteri and Davies, Biggs, Strayer, Stoel and Boley, Portland.

*Sidney E. Thwing* of Thwing, Atherly & Butler, Eugene, argued the cause for respondent Lane County Escrow Service, Inc. With him on the briefs were Walter J. Cosgrave and Cosgrave & Kester, Portland.

*Walter J. Cosgrave* of Cosgrave & Kester, Portland, argued the cause for respondent Transamerica Insurance Company. With him on the briefs were Sidney E. Thwing and Thwing, Atherly & Butler, Eugene.

Before Denecke, Presiding Justice, and Holman, Tongue, Howell, and Bryson, Justices.

BRYSON, J.

**BRYSON, J.**

Plaintiff,[1] depositor, brought this action against defendant, drawee bank, to recover $385,839. Judgment was entered in favor of plaintiff on a jury's verdict in the amount of $245,002.09. Defendant appeals and the plaintiff, being dissatisfied with the amount of the verdict, also appeals.

Plaintiff alleges that defendant "wrongfully" transferred funds from plaintiff's trust account[2] to the personal accounts of two other depositors, one of whom was plaintiff's dishonest employee, Smith, and permitted the two depositors, Smith and Coe, to withdraw those funds for their personal use.

Plaintiff Escrow Service conducts an escrow business in Eugene, Oregon, and has maintained its escrow trust account at defendant's 17th and Oak Street branch for several years. In 1970 plaintiff hired Donald R. Smith as an escrow closer, furnished him with blank checks of plaintiff company, and gave him unrestricted use of its facsimile signature check-signing machine. Between February 1971 and June 1972 Smith used these checks and plaintiff's facsimile signature machine to embezzle sums totaling $665,452.19 from plaintiff's trust account for his personal use and for the use of his friend, William Coe III.[3]

---

[1]Transamerica paid $200,000, pursuant to a dishonesty insurance policy issued to Lane County Escrow Service, Inc., covering employee Smith and is subrogated to this amount. Both plaintiffs will be referred to as plaintiff or Escrow Service.

[2]ORS 696.560 requires that escrow agents treat monies given to them for disbursement in accordance with the provisions of the escrow transaction as "trust funds" and deposit them in a bank separate and apart from the funds belonging to the escrow agent. Although escrow agents must hold these funds in trust, no special trust relationship is created between the bank and the escrow agent. "If a general deposit is properly made by a trustee in his name as trustee, the bank does not become a trustee of the money, but a debtor to the trust. * * *" IV Scott on Trusts 3347, § 527 (2d ed 1956).

[3]Donald Smith worked for plaintiff and left to work for William Coe III, an automobile dealer, and thereafter returned to work as an escrow closer with plaintiff Escrow Service.

[ 947 ]

Smith executed a total of 92 fraudulent checks; some were made payable to himself, some to his friend, Coe, and others to the defendant bank to be deposited to the account of Smith or Coe.

Plaintiff's closers, including Smith, routinely drew checks on Escrow Service's trust account to "pay-off" outstanding mortgages, contracts, and other lawful claims in accordance with the closing instructions in the escrow accounts. As a convenience to its customers, plaintiff's closers were authorized to deposit funds from the trust account directly into Escrow Service's customers' accounts. Accordingly, closers would draw checks on the trust account payable to a bank, including defendant, or a savings and loan association where the customers had an account. The funds represented by these checks payable to banks or savings and loan associations were, on the escrow agent's instructions, credited to the customers' accounts. Plaintiff's escrow closers, including Smith, made deposits to plaintiff's account at defendant bank. No one with management authority at Escrow Service supervised or audited the work done by Smith or the other closers. The evidence indicates that each escrow closer conducted his work on an individual basis for Escrow Service.

Plaintiff seeks judgment against the defendant for a sum equal to the total of 25 of the 92 checks, with interest. Each of the 25 checks is drawn to the defendant's order and is not the payment of any debt owed to defendant bank. Defendant's tellers processed the 25 checks either in accordance with notations which Smith had typed on the lower left corner of the checks or in accordance with Smith's or Coe's personal deposit slips presented with the checks. A sum of money represented by the checks deposited was then credited to the accounts of either Smith or Coe.[4] The record does not indicate how or by whom each of the 25

---

[4] Smith maintained a checking account at defendant's 17th and Oak Street branch. Coe maintained a checking account at defendant's Oakway—Coburg Branch.

checks and deposits was presented. Smith testified that he personally presented some and that others he sent over with the plaintiff's afternoon couriers. It can be inferred, from Coe's endorsement upon several of the checks paid to his account, that he personally deposited some of the checks.

It is uncontradicted that every two weeks defendant sent plaintiff a bank statement together with plaintiff's cancelled checks and that these checks and bank statements were received and examined by plaintiff's bookkeeper. The bookkeeper was not involved in the fraud, but it was her responsibility to reconcile plaintiff's bank statements. Several of these checks, which the bookkeeper must have examined, bear the endorsement of either Coe or Smith, evidencing that they had been credited to the personal accounts of these two individuals. From the time that Smith first began writing checks and embezzling plaintiff's money until Smith confessed his fraudulent activities to plaintiff a period of 16 months had elapsed. During this period plaintiff did not protest any of the payments made by the bank on the checks and did not bring the matter of Smith's defalcation to the defendant's attention.

On appeal defendant bank makes over 24 assignments and sub-assignments of error. Although we have considered all of these assignments, this opinion will review in detail only those assignments of error which merit analysis. Where several assignments of error present similar legal questions, they will be combined so far as practicable.

Defendant contends that it is absolved of all responsibility for the misapplication of the funds represented by these checks by a corporate resolution adopted by Escrow Service, at defendant's request, when Escrow Service began to use its facsimile signature check-signing machine. That resolution authorizes and directs the bank

"* * * to honor and pay any checks * * * when

[ 949 ]

bearing * * * the facsimile signatures of [designated officers] * * * and said The United States National Bank of Portland (Oregon) is hereby authorized * * * to honor and to charge this corporation for such checks, * * * regardless of how or by whom such * * * facsimile signature(s) were made * * * and whether such items are deposited to the individual credit of the officer or person signing them, or to the individual credit of any of the other officers or persons * * *.

"BE IT FURTHER RESOLVED: that this corporation does hereby adopt any and all such facsimile signature or signatures as true and valid signatures by and of this corporation and agrees to save and keep said The United States National Bank of Portland (Oregon) free and harmless from any and all claims or losses of any kind or character resulting from the payment of the checks * * * bearing * * * any such facsimile signature * * *."[5]

In this connection, defendant assigns as error the trial court's refusal to grant its motion for judgment on the pleadings, the granting of plaintiff's motion to strike an affirmative defense based on this resolution, and the court's failure to give certain jury instructions to the effect that because of this resolution defendant was relieved of liability as a matter of law for payment of any checks which were accompanied by deposit instructions.

■ The trial court did not err in these rulings. Although the resolution by its terms precludes plaintiff from contending that the signatures on the checks were not authentic or not authorized, that preclusion does not dispose of the issues in this case. Plaintiff has charged defendant with improper disposition of money on deposit in plaintiff's account, not because defendant paid checks which bore unauthorized facsimile signa-

---

[5] ORS 74.1030(1): "(1) The effect of the provisions of ORS 74.1010 to 74.5040 may be varied by agreement except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care * * * but the parties may by agreement determine the standards by which such responsibility is to be measured if such standards are not manifestly unreasonable."

tures, but because defendant credited the checks which were made payable to the bank to the accounts of Smith and Coe. The issue is not whether the bank should have accepted the signatures on the checks as valid, but whether, assuming the validity of the signatures, the bank was justified in transferring funds represented by the checks to the accounts of third parties who were not the named payees.

The trial court construed the resolution, which was drafted by defendant bank, as relieving the bank only of its potential liability for payment of checks bearing facsimile signatures which were not authorized or not authentic. The resolution, it held, did not excuse the bank if its handling of checks bearing facsimile signatures was otherwise improper. We agree with this construction. The resolution was drafted by defendant bank and furnished to plaintiff for its adoption. The trial court properly applied the accepted rules of construction that a contract will not be construed to provide immunity from the consequences of a party's own negligence unless that intention is clearly and unequivocally expressed, and that an ambiguous instrument, such as the resolution, will be construed against the party who drafted it. *Waterway Terminals v. P. S. Lord,* 242 Or 1, 19, 406 P2d 556, 13 ALR3d 1 (1965); *United Finance Co. v. Anderson,* 212 Or 443, 454, 319 P2d 571 (1958); *U. S. Nat. Bank v. Erickson,* 208 Or 141, 151, 300 P2d 449 (1956). Defendant cites cases from other jurisdictions in which it has been held that similar agreements protected banks from liability for improper payment of checks. These cases are distinguishable. In *Wilmington Trust Co. v. Phoenix Steel Corp.,* 273 A2d 266 (Del 1971) and *Wall v. Hamilton County Bank of Jasper,* 276 So 2d 182 (Fla App 1973) the agreements specifically provided that the banks were authorized to do precisely what they did. In *Professional Invest. Corp. v. Mesquite State Bank,* 480 SW2d 460 (Tex Civ App 1972) the bank was expressly authorized to honor, without inquiry, withdrawals of funds by the custom-

er's employees, even when the instruments of withdrawal were made payable to the bank.

■ Before discussing other specific assignments of error, we consider generally the principles of duty and liability applicable to this case. Although the Uniform Commercial Code governs the relationship between a payor bank and its customers,[6] there are no provisions which cover the precise facts of this case. The Code has not displaced the general rule that, without authority from the maker or other acceptable justification, "a check drawn to the order of a bank precludes the diversion of the proceeds of such check to a use other than that of the drawer * * *." *Robbins v. Passaic National Bank & Trust Company,* 109 NJL 250, 160 A 418, 82 ALR 1368 (1932). See generally, annotations at 82 ALR 1372 and 138 ALR 853. Two Code provisions, although not directly applicable to the facts of this case, nevertheless furnish guidance by disclosing the legislature's intent as to the apportionment of liability in similar situations. Here the signature was authorized and the checks were not altered. ORS 73.4060 provides:

"Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a * * * payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the * * * payor's business."

ORS 74.4060 provides in part:

"(1) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries * * * the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.

"(2) If the bank establishes that the customer failed with respect to an item to comply with the duties

[6] See especially ORS 74.4010 to 74.4070, Relationship Between Payor Bank and Its Customer.

[ 952 ]

imposed on the customer by subsection (1) of this section the customer is precluded from asserting against the bank:

"* * * * *.

"(b)' An unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding 14 calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration.

"(3) The preclusion under subsection (2) of this section does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item.

"* * * * *"

■ The checks involved in this case were not altered and, as we have pointed out, plaintiff is not in a position to assert that the signatures were unauthorized. Therefore, neither of these statutes is applicable according to its express terms. Nevertheless, the deception practiced by Smith is clearly a mere variation on the kinds of deception that these provisions were intended to cover.[7] The general pattern of these sections is to absolve a payor bank, which has been

---

[7] Official Comment 7 to UCC 3-406 (ORS 73.4060) provides an example of that section's application:

"The section applies the same rule to negligence which contributes to a forgery or other unauthorized signature * * *. The most obvious case is that of the drawer who makes use of a signature stamp or other *automatic signing device and is negligent in looking after it* * * *. As in the case of alteration, no attempt is made to specify what is negligence, and the question is one for the court or the jury on the facts of the particular case." (Emphasis supplied.) Uniform Commercial Code, Uniform Laws Annot. 160 (2d Master ed 1968).

Official Comment 3 to UCC 4-406 (ORS 74.4060) explains the rationale of that section as follows:

"* * * This rule follows substantial case law that payment of an additional item or items bearing an unauthorized signature or alteration by the same wrongdoer is a loss suffered by the bank traceable to the customer's failure to exercise reasonable care in examining his statement and notifying the bank of objections to it. One of the most serious consequences of failure of the customer to comply with the requirements of subsection (1) is the opportunity presented to the wrongdoer to repeat his misdeeds. Conversely, one of the best ways to

deceived by a third party, from liability to its customer if the customer's negligence played a substantial part in making the deception possible. However, the bank is absolved from liability only if it has acted with reasonable care or in accordance with reasonable banking standards.

In *Gresham State Bank v. O & K Con. Co.,* 231 Or 106, 370 P2d 726, 372 P2d 187 (1962), we treated ORS 73.4060 as an appropriate guide to decision, although it had not yet become effective. In that case, which was tried as a suit in equity, a dishonest employee appropriated checks which were made payable to his employer, endorsed them without authority to do so, and cashed them at a nearby business establishment. Reviewing the evidence de novo, we held that the negligence of the thief's employer had substantially contributed to the making of the unauthorized signatures, but that the employer was not precluded by its negligence from recovering from the party who had cashed the checks. We held that by cashing the checks without inquiring into the employee's authority to endorse and cash them, the payor had not taken the checks "in accordance with the reasonable commercial standards" of his business as provided in ORS 73.4060.

The present case is an action at law, and we are not called upon, as we were in *Gresham State Bank,* to determine questions of fact and ultimate liability. We note, however, that there was evidence from which the jury could have found that negligence on the part of plaintiff substantially contributed to the success of Smith's fraudulent activities at the outset, and that a reasonable examination of plaintiff's bank statements and cancelled checks would have enabled plaintiff to put an early stop to the entire scheme. There was also evidence that the bank failed to take reasonable

keep down losses in this type of situation is for the customer to promptly examine his statement and notify the bank of an unauthorized signature or alteration so that the bank will be alerted to stop paying further items." *Id* at 394.

precautions in accepting the checks for deposit to individual accounts. Cases on similar facts from other jurisdictions, when not governed by the Uniform Commercial Code, have not been uniform in their treatment of conduct by both parties which could be considered negligent. On occasion, the bank which makes improper payment has been held liable regardless of the customer's negligence.[8] Sometimes the customer's failure to notify the bank of fraud which could have been discovered by examination of bank statements has been treated as a bar to recovery from the negligent bank.[9] In some cases the question of which party's negligence was the legal cause of the loss was for the trier of fact.[10]

The statutes and the *Gresham State Bank* decision indicate that when both defrauded parties have been negligent in permitting fraud by unauthorized signature or alterations in an instrument, the negligent bank or payor must bear the loss. We see no reason for treating differently the situation where negligence on the part of both parties' contributed to the improper allocation of funds covered by checks which were regular on their face, when that negligence is directly related to the issuance and handling of the checks, and to matters which could have been discovered by a reasonable examination of bank statements and cancelled checks. The plaintiff in a case like this should not recover as to any checks which were paid as a result of its negligence or failure to discover what a reasonable examination of its bank statements would have shown, unless the bank failed to use reasonable care, or to follow reasonable banking standards, in accepting the checks for deposit to the accounts or persons other than the named payee. In determining

---

[8] *See, e.g., First Nat. Bank v. Farrell,* 272 F 371 (3d Cir 1921).

[9] *See, e.g., General Cigar Co. v. First Nat. Bank,* 290 F 143 (9th Cir 1923).

[10] *See, e.g., Robbins v. Passaic National Bank & Trust Company,* 109 NJL 250, 160 A 418, 82 ALR 1368 (1932); *Arrow Builders Supply Corp. v. Royal National Bank,* 21 NY2d 428, 228 NYS2d 609, 235 NE2d 756 (1968). *Cf. Federal Insurance Co. v. Groveland State Bank,* 37 NY2d 252, 372 NYS2d 18, 333 NE2d 334 (1975).

whether the bank has acted reasonably the trier of fact may, of course, assess the reasonableness of its conduct in light of plaintiff's conduct. Thus, where there is some evidence of negligence on the part of both parties, the case is for the jury.[11] It follows that plaintiff's cross-appeal, in which it is contended that plaintiff was entitled to judgment as a matter of law for the entire amount prayed for, must fail.

Defendant alleged in its answer that plaintiff, because of its failure to discover Smith's fraud upon examination of its bank statements and cancelled checks, was "estopped" to assert its claim against the bank. The trial court struck these allegations and refused to instruct the jury on the customer's duty of care in this regard, stating:

"* * * [D]efenses number seven, number eight and number nine, which allege estoppel on the basis of plaintiff's negligence in failing to examine statements and cancelled checks and in failing to have an appropriate audit or rely on an appropriate audit, ought not to be submitted to the jury. The defense of negligence of a depositor is available where a bank has acted wrongfully but not negligently as, for example, in honoring a forged signature on a check or a forged endorsement * * *. In other words, if, for example, defenses seven and eight were to remain in the case the Court would be saying

[11]Defendant contends that its negligence, if any, should not have been considered because it was not pleaded. It is true that plaintiff's pleadings leave much to be desired. No facts are alleged beyond the bare statement that defendant "wrongfully diverted" funds from plaintiff's bank account to the accounts of Smith and Coe. Neither the complaint nor the reply contains allegations shedding any light on how the defendant's conduct was "wrongful" or culpable. We can account for this only on the assumption that plaintiff was attempting to hold defendant to strict liability for conversion. However, conversion is not an appropriate theory under these circumstances. A bank deposit creates a debtor-creditor relationship, *State v. Tauscher,* 227 Or 1, 11, 360 P2d 764 (1961); the incidents of that relationship are provided by law (although they may, within limits, be varied by agreement. ORS 74.1030). Plaintiff's action is not, strictly speaking, an action for conversion but to enforce its right as a creditor to repayment of its deposits by the bank. *See* White and Summers, Uniform Commercial Code 508, 551. Defendant's argument is made with reference to allegedly erroneous rulings on evidence. Because we reverse on other grounds, as explained below, and because the issues may develop differently on retrial, we do not pass on these assignments of error.

that a drawee bank may convert funds of a depositor, may divert funds contained in a check payable to the drawee bank, and a depositor may not recover if the depositor negligently failed to discover this by an examination of bank statements and cancelled checks.

"* * * [T]herefore, that those defenses based on that estoppel, seven, eight and nine, are out of the case."

It follows, from what we have said above, that the court's failure to submit this issue to the jury was error. Cases from other jurisdictions concerning the depositor's duty to examine bank statements have analyzed a breach of that duty in varying terms, including negligence[12] and estoppel.[13] ORS 74.4060 says that a depositor is "precluded," under analogous circumstances, from asserting a claim against the bank (unless the bank has also been negligent). *See also* White and Summers, Uniform Commercial Code at 537-40, discussing these issues in terms of "preclusion," "estoppel," and "contributory negligence." Regardless of the terminology employed, defendant's answer alleged facts sufficient to raise the defense of plaintiff's failure to discharge its duty with respect to examination of its bank statements and cancelled checks. The trial court should have submitted this defense to the jury. Also, the jury was told that defendant was liable unless it affirmatively proved that it was justified in believing that plaintiff had authorized the payment of these funds to the accounts of Smith and Coe.[14] In effect, the entire burden of proof was transferred to defendant and, at the same

---

[12] *See, e.g., Arrow Builders Supply Corp. v. Royal National Bank,* 21 NY2d 428, 288 NYS2d 609, 235 NE2d 756 (1968); *Detroit Piston Ring Co. v. Wayne County & H. Sav. Bank,* 252 Mich 163, 233 NW 185, 75 ALR 1273 (1930).

[13] *See, e.g., Robbins v. Passaic National Bank & Trust Company,* 109 NJL 250, 160 A 418, 82 ALR 1368 (1932); *Huber Glass Co. v. First National Bank of Kenosha,* 29 Wis 2d 106, 138 NW2d 157 (1965).

[14] In describing the issues to the jury, the court said:

"And as I've already indicated to you before the arguments began, the plaintiffs have borne the burden of establishing the facts alleged in their complaint and, therefore, the plaintiff has no burden of proving anything in this case. * * *"

[ 957 ]

time, defendant was deprived of the benefit of an appropriate theory of defense. The case must, therefore, be remanded for a new trial.

There are numerous additional assignments of error but, because there is to be a new trial, we mention briefly only those issues that are likely to arise again in substantially the same manner.

■■ Defendant complains of the trial court's refusal to give certain jury instructions concerning the apparent and inherent authority of an agent. Without considering whether these requested instructions were accurate statements of the law, we observe that it was not error to refuse to instruct the jury on these questions because the apparent or inherent authority of Smith to act for plaintiff was not an issue in the case. There is no evidence to indicate that any of the bank's personnel who accepted these deposits ever dealt with Smith as plaintiff's agent or ever relied on his power to act for plaintiff.[15] Under the evidence presented, if there was any reliance by the bank's employees, it could only have been reliance on plaintiff's practice of sending to the bank similar checks with instructions either on their face or on accompanying deposit slips that they be deposited in individual accounts.

Defendant also argues that plaintiff's past practice, and the parties' course of dealing, exonerated the bank as a matter of law from any liability with regard to its handling of these checks. Upon the evidence produced, this argument is not well taken.

■ There was substantial evidence that plaintiff made a practice of drawing checks payable to the bank and of sending them to the bank for deposit into the

---

[15]Defendant relies heavily on *Croisant v. Watrud*, 248 Or 234, 432 P2d 799 (1967), in which we approved the concept, adopted in Restatement (Second), Agency § 161, that a general agent may have inherent power to bind his principal by unauthorized acts, even though the principal has done nothing which would lead third parties to believe those acts are authorized. From our discussion in that case, however, and from the language of § 161 itself, it is clear that this power exists only where the third party deals with the agent and reasonably believes him to be authorized.

accounts of its customers according to instructions either on the face of the check or on an accompanying deposit slip. This evidence was sufficient to raise a jury question whether, in light of this practice, the bank's handling of the checks delivered to it for deposit to the Smith and Coe accounts was reasonable. However, the jury could have found that a number of the checks were presented by Smith and Coe in person rather than included with plaintiff's routine deposits which were delivered by messenger. There is no evidence that anyone at the bank had reason to believe that Smith or Coe was acting for plaintiff when they presented these checks for deposit. It was for the jury to determine whether defendant acted reasonably, in light of all the circumstances, both as to the checks delivered for deposit by plaintiff's messengers and those presented by Smith and Coe in person.

■ Defendant contends that the trial court erred in permitting plaintiff to question certain of its employees about the bank's dealings with Smith and Coe on a number of occasions, some of them unrelated to the fraud. The cumulative tendency of much of this testimony, and accompanying documentary evidence, was to indicate that a person who had knowledge of all the facts testified to would have had grounds for suspicion about the financial activities of these two young men. Because the case is to be retried, we do not rule on the admissibility of specific items of evidence covered by this assignment of error. We note, however, that the legislature, in adopting the Uniform Commercial Code, has indicated that, within a large organization, knowledge of or notice to one individual is not automatically to be attributed to the organization as a whole. ORS 71.2010(27) provides:

"Notice, knowledge or a notice or notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction, and in any event from the time when it would have been

brought to his attention if the organization had exercised due diligence."[16]

On retrial, evidence of information possessed by individual employees of the bank should be limited to that which the jury could reasonably find would have come to the attention of employees responsible for the handling of these checks if the bank had "exercised due diligence."

After the parties rested, defendant, for the first time, raised the issue of plaintiff having ratified Smith's fraudulent scheme by accepting personal checks of Smith and Coe which balanced (in fact created an excessive bank balance) plaintiff's account with defendant. The personal checks of Smith and Coe were overdrafts on their checking accounts[17] with defendant and defendant became the creditor of Smith and Coe in the amount of the NSF checks. Defendant asked for permission to amend its answer to include ratification as a defense, which the trial court denied. No assignment of error is taken on the court's refusal to allow the amendment.

Defendant now contends that the plaintiff ratified the fraudulent scheme and claims the court erred in refusing to give certain requested instructions that would have required the jury to credit any claim of

[16] After the adoption of the Uniform Commercial Code in Oregon, the following explanatory language was added to the Official Text of UCC 1-201(27):

"An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. Due diligence does not require an individual acting for the organization to communicate information unless such communication is part of his regular duties or unless he has reason to know of the transaction and that the transaction would be materially affected by the information."

As to information received by one branch of a bank, see also ORS 74.1060.

[17] Before agreeing to honor Coe's NSF checks, the assistant manager of the Oakway-Coburg branch called plaintiff's office and was assured by Smith that Coe would be receiving funds sufficient to cover the overdraft. Smith's overdraft was apparently honored in reliance on his own assurance that it would be covered promptly.

[ 960 ]

plaintiff in the amounts of the NSF checks which were credited to plaintiff's account.

We conclude that the matter is not properly raised and was not an issue under the pleadings.

Defendant's other assignments of error involve matters which will not, in all likelihood, arise when the case is retried and, therefore, require no discussion here.

Reversed and remanded for further proceedings.