Argued October 25, 1976, affirmed as modified February 16, 1977

STRICKLAND, *Appellant,*

*v.*

ARNOLD THOMAS SEED SERVICE, INC.,
*Respondent.*

(Trial Court No. 12,123, SC P2447)

MKS FARMS, INC., *Appellant,*

*v.*

ARNOLD THOMAS SEED SERVICE, INC.,
*Respondent.*

(Trial Court No. 12,124, SC P2448)

ARNOLD THOMAS SEED SERVICE, INC.,
*Respondent,*

*v.*

FOLKMAN, *Appellant.*

(Trial Court No. 11,495, SC P2449)

ARNOLD THOMAS SEED SERVICE, INC.,
*Respondent,*

*v.*

FOLKMAN, *Appellant.*

(Trial Court No. 10,947, SC P2450)

ARNOLD THOMAS SEED SERVICE, INC.,
*Respondent,*

*v.*

GARNER, *Appellant.*

(Trial Court No. 11,496-L, SC P2451)

ARNOLD THOMAS SEED SERVICE, INC.,
*Respondent,*

*v.*

GARNER, *Appellant.*

(Trial Court No. 11,494-L, SC P2452)

560 P2d 597

Gene Stunz, of Henigson, Stunz & Fonda, Nyssa, argued the cause and filed the briefs for appellants.

Robert W. Collins, Pendleton, argued the cause for respondent. With him on the brief were Sherwood, Tugman, Gose & Reser, Walla Walla, Washington.

Before Denecke, Chief Justice, and O'Connell,* Holman, Tongue, Howell and Bryson, Justices.

TONGUE, J.

*O'Connell, J., term expired January 3, 1977.

[ 166-a ]

**TONGUE, J.**

These six consolidated cases were tried together as suits for accounting. Arnold Thomas Seed Service, Inc., ("Arnold Thomas") is a processor of and dealer in alfalfa seed.[1] The other parties are growers of alfalfa seed who were members of an alfalfa seed marketing pool for which Arnold Thomas acted as marketing agent under the terms of a written marketing agreement drafted by Arnold Thomas. We will refer to these parties collectively as "pool members."[2] This litigation arose out of the conduct of that marketing pool.

Arnold Thomas contends that it inadvertently made overpayments to some of the pool members which it is entitled to recover. The pool members contend that Arnold Thomas breached its contractual and fiduciary duties in a number of particulars, including improper competition with the pool. They argue that the pool members are entitled to an accounting for resulting losses, or for improper profits made by Arnold Thomas, and that Arnold Thomas should be denied any compensation for its services.

After extensive proceedings, the trial court entered decrees giving the pool members some relief.[3] The pool

---

[1] The company is incorporated in California and has its principal place of business in Lowden, Washington.

[2] Not all members of the pool are, however, parties to these cases.

[3] The decrees are based on calculations which treat Arnold Thomas as though it were a pool member; that is, all independent sales by Arnold Thomas were assumed to constitute contributions of seed to, and sales on behalf of, the pool. The resulting judgments were:

For Arnold Thomas against Brent Folkman, Executor of the Estate of George Folkman, Deceased, in the amount of $6,283.25 [reducing by $512.66 Arnold Thomas' claim of overpayment].

For Arnold Thomas against Brent Folkman in the amount of $4,482.64 [reducing by $576.21 Arnold Thomas' claim of overpayment].

For Arnold Thomas against Val Garner in the amount of $59.34 [reducing by $520.39 Arnold Thomas' claim of overpayment].

For Arnold Thomas against Delbert Garner in the amount of $108.33 [reducing by $998.54 Arnold Thomas' claim of overpayment].

For Don Strickland against Arnold Thomas in the amount of $1,100.03 [no overpayment claim by Arnold Thomas].

For MKS Farms, Inc. against Arnold Thomas in the amount of $1,050.16 [no overpayment claim by Arnold Thomas].

members appeal, contending that the relief granted by the trial court was inadequate. We review de novo, and have concluded that the decrees must be modified.

The record in this case is voluminous. Although we have reviewed the entire transcript of proceedings, this opinion will take note only of those facts which we consider material to our decision.

1. *Arnold Thomas undertook the performance of fiduciary duties equivalent to those of a trustee.*

In early 1965, many alfalfa seed growers in Oregon, Washington and Idaho still had on hand much of the 1964 crop of vernal alfalfa seed which had been harvested the previous fall. The usual marketing season was nearly over and the growers, by January of 1965, were finding little or no opportunity to sell the seed they had on hand. In an attempt to better their marketing and financial positions, a number of these growers held a series of meetings to consider formation of a marketing pool for their seed. Arnold Thomas and another seed dealer, Pacific Supply Cooperative, were invited to submit proposals for such an arrangement.

After hearing and considering these proposals, many of the growers decided to enter into a pooling arrangement with Arnold Thomas, and executed individual "Seed Marketing Agreements" to effectuate that arrangement. The agreements, which were executed on or about March 23, 1965, were on printed forms prepared and furnished by Arnold Thomas, and provided, generally, that Arnold Thomas was to have the exclusive right to market all vernal alfalfa seed meeting certain quality requirements produced by each of the growers during the 1964 and 1965 crop years, and that the growers would share in the net proceeds of seed sales in proportion to the amount of seed each had contributed to the pool. For its services, Arnold Thomas was to receive a "market service charge," the amount to depend upon the average price received for the seed in the pool. If the average price

exceeded $34 per hundredweight, the fee was to be $2 per hundredweight, or two cents per pound.

The agreement provided that Arnold Thomas was to have the right to possession and control of the growers' seed throughout the period that the pool was in operation, and the sole right to determine the times and prices at which the seed would be sold. It agreed to "use its best efforts to market Grower's seed to the best advantage."

During the time the pooling arrangement was in effect, 1,473,388 pounds of vernal alfalfa seed from the 1964 crop and 1,161,367 pounds from the 1965 crop were placed in the pool. Of the 1964 seed, 60,000 pounds were contributed by Arnold Thomas. The remainder of the 1964 pool seed, and all the 1965 pool seed, was contributed by growers under the marketing agreements. From these "base pools" 206,610 pounds of seed were eventually withdrawn under the "spot sale" provisions of the agreement (which are discussed in more detail later in the opinion). The remainder was finally sold for the benefit of the pool. Arnold Thomas, following the closing out of the pools, reported that the 1964 pool seed had been sold for an average price of .4252 per pound, and that the 1965 crop had been sold for an average price of .4204 per pound. During the same period, Arnold Thomas also sold, for its own account, 805,052 pounds of certified vernal alfalfa seed at an average price of .4476 per pound.

The pool members contend that Arnold Thomas was a trustee for them and that it breached its duties as a trustee in a number of particulars in the conduct of the pool, especially by engaging in trading in certified vernal alfalfa seed on its own account in competition with the pool. Although Arnold Thomas concedes that its relationship to the pool members was that of a fiduciary, it denies that it was a trustee. In our opinion, whether or not Arnold Thomas was a trustee

in the technical sense,[4] its fiduciary duties were equivalent to those of a trustee under the circumstances of this case. The trial court concluded that Arnold Thomas "undertook a high fiduciary position, vis-a-vis the growers. For practical purposes it was a trustee." We agree. The marketing agreement gave Arnold Thomas control over the pool members' seed, including the sole power to determine the price, dates, and terms of sales. The pool members had no control over any marketing decisions and, indeed, were not kept informed of those decisions.[5] The pool members surrendered to Arnold Thomas complete control over their crops, and were entitled to expect that Arnold Thomas would exercise that control according to the highest standards applicable to a fiduciary.[6]

## 2. *Breaches of fiduciary duties: conflict of interest and competition with the pool.*

We discuss first the pool members' contention that Arnold Thomas improperly bought and sold vernal alfalfa seed on its own account, in competition with the pool. There is no question that Arnold Thomas engaged in these independent transactions. The parties disagree only as to whether Arnold Thomas thereby breached its duty to the members of the pool.

---

[4] Although the marketing agreements give Arnold Thomas virtually complete control over the pool seed, they do not provide for a transfer of legal title.

[5] Although the marketing agreement is silent on the subject, the parties agree that the growers were told, before they became members of the pool, that marketing details would not be disclosed to the members by Arnold Thomas. The purpose of this understanding was to keep this information from competitors.

[6] *See Mountain States Beet G. Marketing Ass'n v. Monroe,* 84 Colo 300, 269 P 886, 889 (1928), where the court under the circumstances of that case, equated the duty of loyalty of a cooperative association, acting as marketing agent for its members, to that of a trustee. We have, of course, frequently recognized the fiduciary duties of an agent, most recently in *Freberg v. Calderwood,* 275 Or 647, 552 P2d 545 (1976). To the effect that the agent's duty of loyalty is equivalent to that of a trustee *see, generally,* Bogert, Trusts and Trustees 480-81, § 543 (2d ed 1960); Restatement 2d on Agency § 387, comment *b* (1958); Restatement 2d on Trusts § 170, comment *a* (1959).

The written marketing agreements contain the following provisions:

"2. COMMINGLING: It is understood that [Arnold Thomas] may market and handle for other growers, seed of the same variety or varieties as herein referred to, and in which the Grower has no interest. Seed so handled by [Arnold Thomas] of the same variety and grade will be considered fungible goods, any unit of which shall be treated and regarded as any other unit of the same variety and grade.

"3. SALE OF SEED: Seeds coming under the control of [Arnold Thomas] which are handled and sold for others shall be commingled, as provided herein and shall be sold by [Arnold Thomas] in [Arnold Thomas'] own name at a price and in such manner and upon such terms as [Arnold Thomas] determines.

"BASE POOL: The Base Pool shall be all such seed of a like variety, quality and grade, by whomever grown, delivered or coming under the control of [Arnold Thomas] during the same pool period. * * *"

Arnold Thomas contends that the agreement is at least ambiguous as to whether independent sales were to be permitted, relying on the provisions for handling and commingling seed "in which the Grower has no interest." It further contends that the evidence establishes that the growers were told, before they signed the agreement, that Arnold Thomas intended to make such sales.

■ The pool members contend that the above provisions, when read together, clearly indicate that all qualifying seed which came under Arnold Thomas' control during the pool period would become a part of the pool, and that *within the pool* the seed would be commingled and treated as a fungible commodity. The attorney who drafted the agreement testified that it was prepared for an associated firm which, at the time, did business on a pool basis only, and that he did not consider the form suitable for use by a pool agent which also engaged in independent transactions. Arnold Thomas personnel did not obtain legal advice

[ 171 ]

before adopting the form for use in connection with this pool. Assuming, as Arnold Thomas contends, that the agreement is ambiguous, that ambiguity will be resolved in favor of the pool members and against Arnold Thomas, the party responsible for the drafting of the document. *Transamerica Ins. Co. v. U.S. Nat'l Bank,* 276 Or 945, 951, 558 P2d 328 (1976); *United Finance Co. v. Anderson,* 212 Or 443, 454, 319 P2d 571 (1958).

■   The evidence is in conflict as to whether the pool members nevertheless understood when they signed the agreements that Arnold Thomas would be engaging in such transactions. We are convinced by the testimony of a number of the growers that there was no such understanding and that, in fact, the growers were told that all of the seed then owned or later purchased by Arnold Thomas would be placed in the pool. The trial court made no express finding on this issue, although its decrees are framed on the theory that Arnold Thomas should be treated as a pool participant. From this we conclude that the trial court believed, as do we, that there was no agreement that Arnold Thomas would be permitted to engage in independent transactions in certified vernal alfalfa seed while acting as agent for the pool.

■■   As a general rule, because of the conflict of interest inherent in the situation, a trustee is under a duty not to compete with a business which he operates as a trustee and, if he violates that duty, will be required to reimburse the trust for resulting losses or to account to the trust for the resulting profits. *See, generally,* Bogert, Trusts and Trustees 568-69, § 543(0) (2d ed 1960); Restatement 2d on Trusts § 170, comment *p,* and § 206, comment *l* (1959). In *Waterbury v. Nicol et al,* 207 Or 595, 606, 296 P2d 487, 298 P2d 211 (1956), we observed:

   "* * * The fundamental duty of loyalty and good faith which a trustee owes to the beneficiaries of a trust and the rigid standard of behavior required of him when

he acts in his own interest in the performance of his duties are recognized by all courts, including our own."

In that same case we quoted with approval the following from 3 Pomeroy, Equity Jurisprudence 814, § 958d (5th ed 1941):

"* * * If the trustee can show, by unimpeachable and convincing evidence, that the beneficiary, being *sui juris*, had full information and complete understanding of all the facts concerning the property and the transaction itself, and the person with whom he was dealing, and gave a perfectly free consent, and that the price paid was fair and adequate, and that he made to the beneficiary a perfectly honest and complete disclosure of all the knowledge of information concerning the property possessed by himself, or which he might, with reasonable diligence, have possessed, and that he has obtained no undue or inequitable advantage, and especially if it appears that the beneficiary acted in the transaction upon the independent information and advice of some intelligent third person, competent to give such advice, then the transaction will be sustained by a court of equity." 207 Or at 607.

Although the quoted passage deals with transactions between the trustee and the beneficiary, we consider the same requirements of full disclosure and consent to be applicable when the trustee enters into direct competition with the trust business, particularly where, as here, he has been chosen as trustee largely because of his experience and expertise in that business.

In *Stephan v. Equitable S & L Assn.*, 268 Or 544, 568, 522 P2d 478 (1974), we held that a trustee had the burden of proof to establish that it clearly explained to the beneficiary that a proposed investment of the trust corpus was one upon which the trustee expected to make a profit for its own account. The present case is analogous, and the burden was on Arnold Thomas to show that the pool members knew that, in spite of the terms of the written agreements, Arnold Thomas intended to deal on its own account, and that they understandingly consented to this arrangement. Ar-

nold Thomas has not carried that burden. We find more convincing the evidence of the pool members who testified that before the marketing agreements were signed representatives of Arnold Thomas told them that all of the seed then owned or later purchased by Arnold Thomas would be placed in the pool.

■ Arnold Thomas contends that the growers knew that Arnold Thomas' business was buying and selling seed, and that it would be unreasonable for them to believe that Arnold Thomas would give up a large part of its normal business in order to earn the relatively modest amount represented by the expected marketing fee. We do not agree. Arnold Thomas undertook to use its best efforts to market the pool seed to the members' best advantage. If it intended to live up to that agreement, it should have had no objection to placing its own seed under the same marketing program. We conclude that Arnold Thomas breached its fiduciary duty by engaging in independent transactions in certified vernal alfalfa seed without the consent of the growers.

3. *Liability of trustee resulting from breaches of fiduciary duty.*

Restatement 2d on Trusts § 207, comment *i* (1959), reads:

> "If the trustee in breach of his duty of loyalty to the beneficiary * * * enters into competition with the interest of the beneficiary, causing a loss to the trust estate, he is chargeable with the loss, even though the trustee personally makes no profit from such competition; and if he makes a profit thereby, he is accountable for the profit."

Under the circumstances of this case, however, the losses to the pool, or the profits gained by Arnold Thomas, resulting from the breach of trust cannot be computed with any degree of certainty. This difficulty, moreover, is a consequence of the breach itself.

Arnold Thomas' witnesses testified that after the formation of the pool in March of 1965 it at first

treated all certified vernal alfalfa seed within its control as fungible. That is, when sales were made, orders were filled without regard to whether the specific seed shipped to a customer belonged to the pool or to Arnold Thomas. At first it was apparently Arnold Thomas' intent to determine at the time a sale was made whether it should be attributed to the pool or to Arnold Thomas (without regard to the actual identity of the seed shipped). Several months went by during which no sales were made on behalf of the pool, but a number were made on behalf of Arnold Thomas. Then, in late 1965 or early 1966, Arnold Thomas personnel decided that prior and future sales should be allocated between Arnold Thomas and the pool on the basis of the original ownership of the seed actually shipped to fill particular orders. Jack McGillis, Arnold Thomas' manager, explained this decision as follows:

"* * * Then at a later point in time after the market started to deteriorate and we realized we had made no specific pool sales against the pool as such because the growers had put a floor on the market, that we were to get above that level; they did set the floor. And after we recognized the market was deteriorating we realized we had a problem.

"Q   Now why did you realize you had a problem?

"A   Well, we felt we would be somewhat embarrassed to try to explain to the pool why their seed had been shipped and brought higher specific sales than we would report to them at a later pool date. So we had a conference with our accountants and our comptroller at that time and it was determined that we should allocate the proceeds as they were specifically shipped. So now this occurred at some later point in time and it was hindsight, it was not foresight, and we went back and gave the pool credit for higher sales that were made specifically for the benefit of local seed growers and Arnold-Thomas."

This explanation is not convincing. Lloyd Arnold, the firm's vice-president, testified that it was up to Arnold Thomas, not the pool members, to determine when and at what prices the pool seed was to be sold. Although a

committee of growers was formed and met periodically with representatives of Arnold Thomas, the evidence is clear that the committee had no power whatsoever over marketing decisions. Even if, as Mr. McGillis testified, the pool members had in fact "put a floor" on the price which should be accepted for the seed, and Arnold Thomas had agreed to respect their wishes, it should not have been embarrassing to explain that no pool sales had been made because the market price had not reached the recommended minimum price.

Whatever the real purpose of this internal accounting decision, it made it virtually impossible to substantiate Arnold Thomas' claim that it acted at all times for the best interests of the pool members in its administration of the pool. Having placed its own interests in direct conflict with those of the pool, Arnold Thomas never set up a complete set of separate books for the pool and did not finally adopt the accounting procedure upon which it later relied until a number of sales had been made and it was in a position to assess the relative impact of alternative accounting systems. Although some pool seed was sold at higher prices than some Arnold Thomas seed, the original accounting to pool members showed that the 1964 and 1965 pools were sold at an average price per pound of .4242 and .4204, respectively, while Arnold Thomas' own transactions during the same period brought it an average price of .4476.

Much of this differential is attributable to a single sale in February 1966 of one million pounds of the 1964 pool seed at 40 cents per pound to Ramey Seed Company.[7] The parties disagree strenuously about the propriety of this sale. Sales of alfalfa seed in such large quantities are unusual in the trade. The evidence was in conflict as to whether the size of the sale would be reflected in a lower price per pound. We are

---

[7] On February 6, 1966, Ramey purchased 500,000 pounds at 40 cents per pound, taking an option on another 500,000 pounds at the same price. The option was exercised within a week.

persuaded by the evidence that such an effect would be likely. The question of Arnold Thomas' good faith in making this sale is a close one. Although we do not in this opinion discuss the evidence in detail, we have considered the matter carefully. Had Arnold Thomas, at the time it made the sale, considered itself a participant in the pooling program, we would be extremely hesitant to question its exercise of marketing judgment. However, Arnold Thomas did not consider itself in that position. It had its own seed to market, and it placed that seed, for the most part, at higher prices. Although the arguments advanced by Arnold Thomas to justify this unusual sale are plausible, and there is some evidence to support them, there is also evidence that Arnold Thomas was not acting solely in the interests of the pool members when it made this sale at a distress price. We find that Arnold Thomas has not carried its burden of showing that this extraordinary sale was made in the exercise of its best judgment considering only the interests of the pool members. It is equally likely that the sale was made in order to relieve Arnold Thomas of the burdens of pool administration in a way which would not interfere with the orderly marketing of its own seed and would enable it, at the same time, to collect the maximum marketing fee.

4. *Improper handling of hardship or "spot" sales.*

The marketing agreements contain the following provisions:

"SPOT SALES POOL: If, in the judgment of [Arnold Thomas], market conditions at any specific time do not warrant selling from the Base Pool, then at such time, the Grower may in writing request [Arnold Thomas] to place a part or all of Grower's uncommitted share of the Base Pool into a Spot Sales Pool for sale at a price which reflects the general market level at time of sale. The Spot Sales Pool may be utilized to market all or a part of the Grower's uncommitted portion of the Base Pool * * * when the Grower and [Arnold Thomas] mutually agree that through unforeseen circumstances there is a defi-

[ 177 ]

nite need to sell such quantity of Grower's seed to alleviate what would otherwise prove to be a definite hardship to the Grower. [Arnold Thomas] may sell such seed as comprises each particular Spot Sales Pool at a price which reflects the general market level at time of sale."

In December of 1965 several pool members applied to Arnold Thomas for hardship or "spot" sales under these provisions. On behalf of Arnold Thomas, Mr. McGillis approved the sale of a total of 266,610 pounds of seed at a price of 44 cents per pound. In fact, however, no "spot sale pool" was established and most of the seed was not sold at that time.[8] Arnold Thomas simply paid the pool members 44 cents per pound for the seed which was estimated to be eligible for a hardship sale. Later Arnold Thomas decided to treat the sale as a purchase by the pool.

This treatment of hardship or "spot" sales was not authorized under the marketing agreements. Arnold Thomas had no authority to purchase seed on behalf of the base pool. Arnold Thomas contends that, nevertheless, the net result of these transactions was beneficial to the base pool. It presented at trial a schedule, prepared for purposes of the trial, showing that a series of sales between December 30 and January 18, at prices ranging from 44 cents to 49.3 cents per pound, were treated as resales by the pool of the spot sale seed. We have not been referred to any evidence that these sales were treated in this way at the time. Arnold Thomas' accountant testified that the schedule was prepared on the basis of his recollections of how the spot sales were handled. The pool members point out that the overall effect of these transactions was to leave in the base pool, at a cost of 44 cents per pound, more than a quarter of a million pounds of seed which would have been withdrawn by early 1976 if the spot

---

[8]There was a sale of 100,020 pounds of seed at 44 cents per pound on December 30, 1965, which Mr. McGillis testified was made to establish the market price.

sale provisions of the agreement had been complied with. A substantial quantity of this seed was, in effect, included in the subsequent Ramey sale at 40 cents per pound. It is clear that these unauthorized transactions resulted in at least some loss to the pool.

5. *Arnold Thomas may not retain its marketing fee.*

Because we have concluded that Arnold Thomas has failed to show that its marketing judgment was not influenced by its conflict of interest, we agree with the pool members that the trial court's resolution of this case does not afford them adequate relief. The decrees are based on an accounting treatment which assumes that Arnold Thomas was a pool participant, sharing pro rata in the net proceeds of all sales of certified vernal alfalfa seed during the pool period. This approach assumes that the Ramey sale was proper, and that the pool members and Arnold Thomas should share the effect that this large low price sale had on the overall average price received for the alfalfa seed. We are not convinced the Ramey sale would have been made if Arnold Thomas had acted solely in the interests of the pool.

However, the record does not provide any reliable basis for computing actual damages to the pool. Although there is considerable evidence of the market price of certified vernal alfalfa seed during the pool period, it is clear that there is no ready "market" for this commodity in the sense that a sale on a given day at the quoted market price is always possible. Price quotations are sometimes merely "nominal"—that is, they are estimates of a price if there were a buyer, rather than the results of active and continuous buying and selling. It would not be realistic to base a decree upon an assumption that the pool seed could have been disposed of at the quoted market price on any given day.

The pool members have proposed alternative approaches to providing adequate relief. One proposal is

that we treat the pool seed as though it were sold on December 1, 1965, at that day's market price of 44 cents per pound. They contend that on or about that date Arnold Thomas falsely represented to the growers that most of the pool seed had been sold, and it would, therefore, be proper to, in effect, compel Arnold Thomas to purchase the seed at the market price quoted for that date. Although the evidence supports their contention that false representations were made, the growers were not told that all of the pool seed had been disposed of at the December 1 market price. Although Arnold Thomas breached its duty to the pool members by misrepresenting the rate of progress of the pool marketing program, there is no reason to choose the date on which those misrepresentations were made as the date by which to measure losses to the entire pool.

Alternatively, the pool members contend that it would be equitable to give the pool the benefit of the most favorable sales of certified vernal alfalfa seed during the pool period. If this were done, Arnold Thomas rather than the pool would be treated as the seller of most of the one million pounds purchased by Ramey at 40 cents per pound. This approach is appealing in principle.

In 3 Scott on Trusts 1673, § 205.1 (3d ed 1967), we find the following discussion:

"* * * The question of the liability of a trustee to a surcharge where he has committed a breach of trust and a loss to the trust estate has followed, but where the loss would have occurred even if there had been no breach of trust, is one which has not been much discussed until recent times. * * * Undoubtedly the trustee should be held liable where he does not act in good faith, as for example where he is guilty of self-dealing or where he purchases property for the trust but takes title in his own name for the purpose of later claiming the property as his own if it should prove profitable and allocating it to the trust if it should prove unprofitable. Even though he had no such purpose in mind, the fact that he puts

[ 180 ]

himself in a position where he might be able to make such a retroactive allocation is a good reason for holding him liable for any loss which ensues."

The present situation is similar. Arnold Thomas, by engaging in independent transactions in certified vernal alfalfa seed placed itself in a position to allocate favorable sales to itself and unfavorable sales to the pool. It did not employ an adequate accounting system. It made an unusual sale at a price lower than most it had received at a time when, according to a recent accounting decision, it could allocate virtually the entire 40 cent sale to the pool. We do not hold that Arnold Thomas acted with a deliberate intent to deceive or to avoid its responsibilities to the pool members. We do believe, however, that its insensitivity to the high degree of duty owed by a fiduciary in its position resulted in a situation in which it might have acted solely in its own interest and we are unable to determine with any certainty the real reasons for significant market decisions. In our recent decision in *Jimenez v. Lee,* 274 Or 457, 547 P2d 126 (1976), we applied the rule that all doubts will be resolved against a trustee who maintains an inadequate accounting system. Arnold Thomas' accounts are not inadequate in the sense that we were discussing there. Records were kept of the source, the handling, and the ultimate disposition of all seed. However, there was never a complete separate set of books kept for the pool. Mr. McGillis testified that, because Arnold Thomas' seed and that of the pool were commingled, a separate accounting for the pool became impractical. These and other accounting deficiencies, together with the inherent conflict of interest, raise doubts which should be resolved against Arnold Thomas as trustee.

However, we do not believe this approach is practical in the present case. Although the parties have represented that all of the records necessary for a complete resolution of this case are in evidence, it would be a task beyond the resources of this court to reconstruct such an accounting. The proper disposition

of such items as freight and handling expenses, for example, make the job one for an accountant. Under this approach we could only remand for further proceedings in a case which has already been in litigation for nearly eight years. Those proceedings would likely be prolonged and expensive. We prefer, if possible, to find an approach under which this court can render a final decision.

■ The pool members also contend that, as a consequence of its mishandling of the pool, Arnold Thomas should not be permitted to retain the marketing fee. It is within the discretion of a court of equity to deny compensation to a trustee who breaches his duties. *Wood et al v. Honeyman et al,* 178 Or 484, 569, 169 P2d 131 (1946); Restatement 2d on Trusts § 243 (1959). The exercise of that power is discussed in 3 Scott on Trusts 2139, § 243 (3d ed 1967), as follows:

> "Where a trustee has committed a breach of trust, the court may in its discretion either allow him full compensation, or deny him all compensation, or allow him a reduced compensation. Where his compensation is reduced or denied, this is done not for the purpose of imposing a penalty upon him for committing a breach of trust but on the ground that he has not properly performed the services for which compensation is given."

*See also* Bogert, Trusts and Trustees 406-07, § 980 (2d ed 1962).

Arnold Thomas contends that compensation should only be denied in cases like *Wood et al v. Honeyman et al, supra,* in which the trustee has converted trust property to his own use. Our cases do not recognize any limitation on the kinds of breach of trust which can result in the denial of compensation, although it appears that we have in the past denied compensation only when the breach has been serious. *Compare Wood et al v. Honeyman, supra,* with *Gorger v. Gorger,* 276 Or 267, 555 P2d 1 (1976). *Cf. American Timber & Trading Co. v. Niedermeyer,* 276 Or 1135, 558 P2d 1211 (1976); *Tripp v. Barkdoll,* 263 Or 325, 332, 502 P2d 219 (1972).

■   In the present case Arnold Thomas, in addition to creating a conflict of interest without the consent of the pool members, failed to maintain adequate records, commingled its own seed with that of the pool,[9] commingled pool funds with its own, and, at times, gave pool members false information about the status of the pool. We do not find that there was any fraudulent purpose behind these derelictions. Rather, it is our opinion that Arnold Thomas failed to take seriously the duty of loyalty and diligence which was imposed by its position. We consider its behavior sufficiently serious to justify either a reduction or denial of its compensation. The pool members contracted for Arnold Thomas to perform the many tasks associated with the marketing of their seed crops for 1964 and 1965. They also contracted for the exercise, in their collective best interest, of Arnold Thomas' marketing judgment in light of its position in the trade and its expertise as a dealer in alfalfa seed. They received the former, but we are not convinced that they received the latter.

If we could, without imposing an undue burden on the parties by requiring further proceedings, order adequate compensation of the pool members for actual losses caused by Arnold Thomas' breaches of duty, we might consider a reduction of compensation appropriate. But Arnold Thomas' actions have made it virtually impossible to determine what the pool should have received for its seed. Under the circumstances, therefore, we hold that Arnold Thomas may not retain any compensation in the form of a marketing fee from the litigant pool members.

---

[9] "Blending" of seed to attain a uniform quality within a single shipment is an accepted practice in the trade. Arnold Thomas, however, blended seed without regard to its ownership. It now contends that this practice resulted in an over-all benefit to the pool because Arnold Thomas seed was, on the average, of higher quality than that contributed to the pool. The pool members contend that Arnold Thomas seed was in fact of lower quality, and that Arnold Thomas was the beneficiary of this practice. Each position was supported by expert testimony. Our disposition of this case makes it unnecessary for us to determine which position is correct.

Arnold Thomas made its purported final pool settlement on January 16, 1967, at which time a deduction was made for the marketing fee. Since that date Arnold Thomas has thus had the use of funds to which, because of its breaches of trust, it was not entitled. It is within the discretion of a court of equity to award interest on money improperly used or withheld by a trustee. The manner in which this discretion will be exercised depends upon the facts and circumstances of the particular case. *Stephan v. Equitable S & L Assn.,* 268 Or 544, 571-73, 522 P2d 478 (1974); *Duniway v. Barton,* 193 Or 69, 88-89, 237 P2d 69 (1951); *Camas Logging Co. v. Haskins et al,* 221 Or 182, 192, 349 P2d 852 (1960). In our opinion the impropriety of Arnold Thomas' administration of the marketing pool, the impracticality of determining the resulting actual losses to the pool, and the fact that Arnold Thomas has had the use of these funds since the closing of the pool make this a proper case for the allowance of interest. *See Emrich v. Emery et al,* 216 Or 88, 99-100, 322 P2d 1045, 335 P2d 604, 337 P2d 972 (1959).

We hold, therefore, that the trial court's decrees will be modified to allow each litigant pool member a credit of two cents per pound, the amount of the fee charged by Arnold Thomas, for all seed he contributed to the base pool, plus simple interest at six percent from January 16, 1967.[10]

As so modified, the decrees of the trial court are affirmed.

---

[10]The amount of the modification for each litigant pool member is as follows:

| | Total seed in pool | Credit at two cents per pound (Plus six percent interest from January 16, 1967) |
|---|---|---|
| Estate of George Folkman | 92,796 pounds | $1,855.92 |
| Brent Folkman | 36,066 pounds | $ 721.32 |
| Val Garner | 87,313 pounds | $1,746.26 |
| Delbert Garner | 161,520 pounds | $3,230.40 |
| Don Strickland | 191,701 pounds | $3,834.02 |
| MKS Farms, Inc. | 178,322 pounds | $3,566.44 |