419 A.2d 1227

**JACOBY TRANSPORT SYSTEMS, INC., Appellant,**

v.

**CONTINENTAL BANK, and Girard Bank, and Ray Slater.**

Superior Court of Pennsylvania.

Argued Sept. 11, 1979.

Filed April 25, 1980.

John J. O'Brien, Jr., Philadelphia, for appellant.

Ronald H. Surkin, Philadelphia, for appellee.

Before SPAETH, HESTER and CAVANAUGH, JJ.

SPAETH, Judge:

This is an action against a bank for honoring checks claimed to have been unsigned and therefore issued without authority. The critical issue is whether the drawer of the checks is precluded by its negligence from asserting the lack of authority.

In April 1970, appellant opened a regular checking account at the Hunting Park branch of appellee Continental Bank. Appellant had its checks printed by its own printer to its own specifications. Record at 228a. In the lower right hand corner, where ordinarily the drawer signs a check, appellant had printed its full corporate name, "Jacoby Transport System, Inc.," with no signature lines underneath. Paul Pidgeon, assistant vice–president of Continental's depositing–accounting department, testified that Continental will print personalized checks for its customers, and that in the case of a corporate customer, such checks will generally have two signature lines below the corporate name. Record at 323a. Robert Campbell, also an assistant vice-president of Continental, testified that when a corporate customer opens an account, the bank obtains a resolution listing the officers authorized to sign checks on behalf of the corporation and a signature card containing their signatures. Record at 236a. On file at Continental's Hunting Park branch was a signature card containing the following signatures: "Lee Burgher, Harold Burgher, James Burgher." Record at 339a. The name, "Jacoby Transport System, Inc.," did not appear as a signature on the card. Record at 340a.

On October 18, 1972, Harold Burgher, sole owner of appellant's stock and its secretary–treasurer, and Ray Slater entered into an agreement by which appellant agreed to buy Slater's trucking business for $16,000, with a down payment of $3,000 and weekly payments of $250, with 6% interest. Record at 490a–491a. When Slater was unable to deliver

title to all the equipment at settlement, Burgher gave Slater a check for $3,000, for the down payment, and a folder of post–dated checks covering the balance of the purchase price. The first of the post–dated checks was dated October 30, 1972. The next November 6, 1973, and so on until the last, dated September 17, 1973. Record at 495a–511a. None of the checks, however, had Burgher's or any other authorized signature below the name "Jacoby Transport System, Inc.," in the lower right hand corner. When Slater remarked to Burgher that the checks were unsigned, Burgher replied that each check would be signed as and when he received the completed certificates of title covering the equipment. Record at 457a.

Slater proceeded to negotiate the checks by presenting them to the Girard Bank, without obtaining Burgher's or any other authorized, signature.[1] Pidgeon testified that the checks made their way to Continental through a clearing house. He further testified that Continental's bookkeeping personnel did not examine such checks for facial regularity because of the volume processed by the bank on a daily basis—approximately 94,000, Record at 288a—and a clearing house rule requiring return of the checks, Record at 308a; the only time such an examination was made was in special circumstances, such as an outstanding stop payment order, or because the account was on customer referral, Record at 308a. Pidgeon testified that Continental's practice was to examine for facial regularity only checks that it cashed, Record at 309a, and that the practice of other banks in Philadelphia was essentially the same, Record at 311a–312a.

Between October 20, 1972, and May 23, 1973, Slater negotiated 38 of the unsigned checks that Burgher had given him at settlement. Appellant received at least one of the 38 checks in each of its monthly statements from Continental for the months October 1972 through May 1973. Record at

1. Continental joined Girard as an additional defendant, and Girard joined Slater as an additional defendant. Given our holding in this case, we need not determine the liability of either additional defendant.

518a–530a. These statements were received by appellant about the first of the month. On each statement was the following notation in large, bold–face type:

PLEASE EXAMINE AT ONCE. IF NO ERRORS ARE REPORTED WITHIN TEN DAYS, THIS ACCOUNT WILL BE CONSIDERED CORRECT.

Record at 310a, 311a, 516a.

However, appellant's bookkeeper, one Ann Welser, did not examine the October 1972 statement until late in November 1972, about three or four weeks after receiving it. Record at 270a–271a. She was similarly late in examining the subsequent statements. Record at 271a–273a.

Welser testified that when the first unsigned check was returned to appellant with its monthly statement, she asked Burgher whether she should have a stop payment order issued on the still outstanding unsigned checks. Record at 276a. She said she made this inquiry every time she went over a monthly statement, but that each time Burgher only responded that he "would call" Slater. Record at 276a–277a.

Burgher contradicted his bookkeeper's testimony. He testified that when he became aware of the unsigned checks, which he said was in December 1972, he instructed Welser to call the manager of Continental's Hunting Park branch. Record at 52a. Although he testified that "[Welser] told the bank officer not to cash any more checks without a signature," Record at 72a, Burgher also testified that Welser did not tell the bank officer that there were other unsigned checks still outstanding, *id.*, although he conceded that he knew that at that time there were 59 such other checks, Record at 70a. Campbell, who was the branch manager of the Hunting Park branch between March 1972 and June 1973, denied having ever had any conversation with Welser in which she told him that Continental was honoring appellant's unsigned checks. Record at 216a.

Burgher further testified that when nothing happened after Welser's alleged call to Continental in December, he went in person to see Campbell in February 1973. According to Burgher, Campbell said, "Gee whiz, are they still

paying them checks without a signature?", and also, that he would "take care of it." Record at 54a–55a. Campbell denied this conversation, and further testified that Burgher was in the branch office once a week between October 1972 and June 1973 to gain access to the safety deposit box, but on none of these occasions discussed the Slater checks. Record at 217a, 218a.

Burgher further testified that when, despite his asserted conversation with Campbell, Continental continued to honor the unsigned checks, he "finally had to go down to 15th and Market to talk to a Mr. Eugene Zuecca." Record at 55a. He said that this occurred in February or March of 1973, and that after he had talked to Zuecca, "[t]hey finally stopped cashing the unsigned checks." Record at 56a. However, on cross–examination Burgher changed his testimony. When it was pointed out to him that the last check honored was dated May 23, 1973, he admitted that he could not have spoken to Zuecca before that date. Record at 91a. He also admitted that "between February, when you allegedly spoke to Mr. Campbell and June when you spoke to Mr. Zuecca," some $4,000 worth of unsigned checks were honored. Record at 92a. He explained his inactivity by saying that his son had spoken to Continental, *id.* However, on his deposition Burgher's son, Lee Burgher, testified that he had not at any time spoken to anyone at Continental regarding the unsigned checks. Record at 92a. He said, "I do recall my dad asking me to get a hold of Mr. Campbell and then he changed his mind." *Id.*

On June 14, 1973, Burgher placed a stop payment order on the remaining outstanding unsigned checks. Continental then placed the account on referral, which meant that no more of the checks were honored. Record at 112a, 320a–322a. Burgher testified that he did not place a stop payment order earlier because he did not believe that Continental "would cash a check without a signature." Record at 179a; he did not explain how he could have held this belief, given that he knew that Continental had been cashing the checks. The record also suggests that he thought it would

cost him $180 ($3.00 per check) to stop all the checks, and that this supposed expense may have been a reason for not placing a stop payment order earlier. Record at 175a. Burgher conceded that he had never asked anyone at Continental what could be done to protect his account from having further checks cashed on it. Record at 186a. Campbell testified that in fact, it would have cost only $3.00 to stop payment on all of the checks. Record at 222a.

The lower court held that appellant was precluded from arguing that Continental had acted improperly in honoring the unsigned checks because appellant had issued them and could and should have stopped payment on them as soon as it became aware that Slater was negotiating them. The lower court based its decision on the Uniform Commercial Code, 12A P.S. § 3–406 (Purdon's 1970), which provides:

> Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

1953, April 6, P.L. 3, § 3–406, eff. July 1, 1954. Reenacted 1959, Oct. 2, P.L. 1023, § 3, eff. Jan. 1, 1960.

■ Appellant argues that Section 3–406 applies only to forged or altered signatures. It is true that so far this has been its application in this state. *See Commonwealth v. National Bank and Trust Company of Central Pennsylvania*, 469 Pa. 188, 192, 364 A.2d 1331, 1333 (1976); *Thompson Maple Products, Inc. v. Citizens National Bank*, 211 Pa.Super. 42, 234 A.2d 32 (1967). It is also true that we might regard the facts in this case as presenting neither "a material alteration" nor "the making of an unauthorized signature." We believe, however, that section 3–406 should be given a liberal rather than literal interpretation. Stated generally, the purpose of section 3–406 is to offer some measure of protection to a reasonable businessman who acts

in good faith. It is somewhat inconsistent with this purpose if the protection thus afforded is made to depend upon nice distinctions. *Cf. Transamerica Ins. Co. v. United States Nat'l Bank*, 276 Or. 945, 558 P.2d 328 (1976) (applying the principles of Section 3–406 even where the fact situation did not literally fall within the terms of the statute). Here, in one sense Slater did not engage in "the making of an unauthorized signature"; that is, he did not himself sign the unsigned checks. However, the checks looked as though they were signed—at least, so they looked to the tellers who cashed them—and Slater did take advantage of that appearance by presenting the checks as though in fact they were signed. To hold that by taking such advantage Slater did not engage in "the making of an unauthorized signature" would be to draw a distinction between, on the one hand, a case where the actor creates an appearance, and on the other, a case where he takes advantage of an appearance already created. We believe such a distinction would be arbitrary, for in both cases the actor is dishonest, and in both the reasonable businessman is injured. We therefore hold that here at least, without implying what might be so on a different record, the lower court was justified in finding that there had been "the making of an unauthorized signature" within the meaning of section 3–406.

■ This decided, the question becomes whether the other requirements of section 3–406 were satisfied. Specifically: (1) Was appellant "negligen[t]"? (2) If so, did appellant's negligence "substantially contribute [ ] to . . . the making of [the] unauthorized signature[s]?" (3) If so, in honoring the checks, did Continental act "in good faith and in accordance with the reasonable commercial standards of the [banking] business?"

Section 3–406 operates as a "conditional estoppel which shields a bank from liability where a drawer's negligence 'substantially contributes' to an alteration or forgery." *Commonwealth v. National Bank and Trust Company of Central Pennsylvania, supra*, 469 Pa. at 189, 364 A.2d at 1333. To avail itself of this estoppel, Continental had to

prove that all of the three requirements of section 3–406 were satisfied. *Twillman v. Lindell Trust Co.,* 534 S.W.2d 83 (Mo.App.1976). "The negligence necessary to preclude or estop the drawer from its rights against the drawee must have been some act upon which the drawee relied or which affirmatively induced and contributed to the drawee's acceptance of the forged endorsement. . . . Mere laxity in the conduct of the business affairs of the drawer is not such negligence as to preclude or estop him from recovery against the drawee bank for the amount charged against his account as a consequence of the bank's payment of a check bearing a forged endorsement." *East Gadsden Bank v. First City National Bank of Gadsden,* 50 Ala.App. 576, 281 So.2d 431 (1973).

With respect to the first two requirements of section 3–406: We have no difficulty in concluding that appellant was negligent, and that its negligence substantially contributed to the unauthorized signatures and attendant loss. Appellant itself had the checks printed in a manner that made them look as though they were signed. 12A P.S. § 3–401(2) provides:

A signature is made by use of any name, including any trade or assumed name, upon an instrument, or by any word or mark used in lieu of a written signature. 1953, April 6, P.L. 3, § 3–401, eff. July 1, 1954. Reenacted 1959, Oct. 2, P.L. 1023, § 3, eff. Jan. 1, 1960.

In *Pollin v. Mindy Mfg. Co., Inc.,* 211 Pa.Super. 87, 236 A.2d 542 (1967), we held that a corporation might have a printed name as an acceptable signature, although in that case the existence of two blank lines below the printed name suggested that it was not intended to be the signature. *Cf. Leahy v. McManus,* 237 Md. 450, 206 A.2d 688 (1965) (a corporation may validly sign an instrument by stamp). It would have been a simple matter for appellant to have had its printer place signature lines below its corporate name. Having had the checks printed without distinctive signature lines, appellant heedlessly issued them, thus making their negotiation possible. It would have been a simple matter

for appellant to have withheld the checks until Slater had delivered good title to the equipment, as he was required to do. Finally, and most important, when appellant became aware that Slater was negotiating the checks, it took no effective action to stop him until June 14, 1973, by which time 38 had been negotiated. In this regard, we are unable to accept Burgher's testimony.[2] It was not only contradicted by his own bookkeeper and son, but it is on its face inconsistent and implausible. Even if we were to accept Burgher's testimony that first his bookkeeper and then he spoke to Campbell before he finally procured a stop payment order, still his negligence would be apparent, for he conceded that in neither of those asserted conversations was Continental informed that there were other unsigned checks outstanding. Record at 72a, 97a. The lower court's conclusion that any loss suffered by appellant "was occasioned by its own negligence," Slip op. at 5, is amply supported by the record.

With respect to the third requirement of section 3–406: While we have no difficulty in concluding that Continental honored the checks in good faith, it is only after considerable reflection that we have concluded that in honoring the checks, Continental acted in accordance with the reasonable commercial standards of the banking business. The signature card on file with Continental listed only appellant's officers as authorized to sign the checks; it thus gave notice that "Jacoby Transport System, Inc.," was not appellant's signature. If Slater had presented the checks to Continental—instead of to Girard—and this action were based on the failure of Continental's tellers—instead of being based on the failure of Continental's bookkeeping personnel—to notice that there was no authorized signature on the checks the result might be different. *See Empire Moving Corp. v. Hyde Park Bank*, 43 Ill.App.3d 991, 2 Ill.Dec. 753, 357 N.E.2d 1196 (1976) (where bank had corporate resolution with offi-

2. The lower court made no specific findings of fact. However, the court referred to the fact that Burgher's testimony had been contradicted, Slip op. at 2, and it could not have held as it did unless it found itself unable to accept Burgher's testimony.

cers' signatures and its teller cashed check made out to corporation but endorsed only with printed corporate name, bank could not assert section 3–406 defense). Here, however, Pidgeon testified that given the volume of business and the way the clearing house worked, the bank's bookkeeping personnel were simply not able to examine each check with reference to the appropriate signature card, unless the customer put the bank on notice, as for example by a stop payment order. Further, Pidgeon testified that the practice of other banks in Philadelphia was essentially the same as Continental's. None of this testimony was contradicted. We recognize that even given Pidgeon's testimony, it is arguable that a bank should not be permitted to shift onto its customer the burden of determining whether a check bears an authorized signature. *See Perley v. Glastonbury Trust Co.*, 19 U.C.C.Rptr.Serv. 188 (Conn.Sup.Ct.1976) (even where modern banking practices meant that drawee bank's personnel could not detect forgery in endorsement of individual payee, bank precluded from asserting section 3–406 defense because bank is better insurer against loss than private party). However, in our opinion the definition of "reasonable business standards" should not be formulated in so one-sided a way. Even a bank is entitled to expect some degree of prudence on the part of its customer. Here appellant exhibited no prudence at all; it knew at least as early as December that Slater had negotiated one of the unsigned checks, and with very little effort, could have precluded any negotiation of the outstanding checks. In the circumstances, we are not disposed to disturb the lower court's finding that "[t]he evidence herein indicates that [Continental] followed the usual and normal course of banking procedure." Slip op. at 5.[3]

---

**3.** No doubt the lower court's finding should have been expressed in the language of section 3–406. However, when read in context, there can be no doubt that in finding that Continental had followed "the usual and normal course," the lower court intended to express its opinion that Continental had met the statutory standard of acting "in accordance with the reasonable commercial standards" of its business. Not only did the lower court quote section 3–406, but in the sentence immediately preceding its reference to "usual and normal,"

Affirmed.[4]

HESTER, J., concurs in the result.

the court stated that "a bank is held to perform in the reasonable and ordinary standards of the banking business." Slip op. at 5.

4. We note the possible application of two other theories to the facts in this case; whether they would be applicable, we need not decide. The first theory would involve the issue of whether appellant had acted with "reasonable care and promptness to examine [its] statements . . . to discover [the] unauthorized signature[s]. . . See 12A P.S. § 4–406; WHITE AND SUMMERS, UNIFORM COMMERCIAL CODE § 16–7 (1972); *New York Credit Men's Adjustment Bureau, Inc. v. Manufacturers Hanover Trust*, 41 App.Div.2d 912, 343 N.Y.S.2d 538 (1973). The second theory would involve the issue of whether a common law estoppel had been shown. See 12A P.S. § 1–103; *West Penn Administration, Inc. v. Union Nat'l Bank*, 233 Pa.Super. 311, 332–33, 335 A.2d 725, 735 (1975).