**COMMERCIAL CREDIT EQUIPMENT CORP., a corporation, Plaintiff-Appellee,**

v.

**The FIRST ALABAMA BANK OF MONT-GOMERY, N.A., a National Banking Association, Defendant-Appellant.**

No. 79–3747.

United States Court of Appeals, Fifth Circuit. Unit B

Feb. 12, 1981.

Rehearing Denied March 30, 1981.

G. Griffin Sikes, Jr., Montgomery, Ala., for defendant-appellant.

Ball, Ball, Duke & Matthews, Richard A. Ball, Jr., Charles B. Paterson, Montgomery, Ala., for plaintiff-appellee.

Before MORGAN, FAY and FRANK M. JOHNSON, Jr., Circuit Judges.

FAY, Circuit Judge:

From a judgment for plaintiff-appellee, Commercial Credit Equipment Corporation (Commercial), as drawer of a forged check, against defendant-appellant, First National Bank of Montgomery (Bank), as payor of that check, ordering the Bank to remove the hold payment on Commercial's account for the amount of the check,[1] the Bank appeals. The Bank asserts as error the trial court's rejection of its defense, based on Alabama Code § 7–3–406, that various acts by Commercial constituted negligence substantially contributing to the making and acceptance of the forged check, which should estop Commercial from asserting its claim against the Bank for the removal of the hold on its account. We hold that the trial court erred, as a matter of law, in failing to find for the Bank on the basis of its defense. Accordingly, we reverse and remand with instructions to enter judgment for the Bank.

The primary figure in this case is C. Mercer Jones (Jones), a former employee of Commercial. Jones was hired on May 15, 1978 to serve as the company's collection manager, a position all parties agree was one of trust. Jones was responsible for collecting past due accounts. His work was largely unsupervised and involved handling relatively substantial amounts of cash.[2] He was under a fidelity bond while working in that position.

Jones' employment with Commercial originated when he was referred by an employment agency in early May 1978. Prior to that time he was unknown to the individuals at Commercial responsible for hiring, E. L. Norris, the assistant regional manager, and J. L. Stewart, the regional manager. Norris interviewed Jones on May 9, 1978, at which time Jones filled out a job application. After a second interview, con-

---

1. Actually, the hold on Commercial's account was for $1,848.75 less than the amount of the forged check. This represents the amount the Bank was able to recoup from Jones. Accordingly, the amount in controversy in this case is $43,651.25.

2. Jones routinely carried between $1,000 and $8,000 of the company's money on his person. At the time he was asked to resign he had $2,000 of company money which he had not turned in.

ducted by Stewart, Jones was hired. Jones was not investigated by a credit bureau or credit reporting service, although it was Commercial's admitted standard practice to do so; he was not asked for credit references; no check was made of his creditors in Dothan, the city in which he previously had resided; and the personal references which he provided were not even contacted. The only inquiry made was to E. L. Gregory (Gregory), the manager of the Ford Motor Credit Corporation in Dothan, and Jones' former employer. The parties do not agree when Norris called Gregory, nor does either claim to recall the precise language of that conversation. We do not think either of those facts are particularly significant. What is important is that Gregory was not questioned in any way as to Jones' honesty or trustworthiness, nor was Gregory asked why Jones left his employment or if the company would rehire him. Had even such perfunctory inquiry been made, Norris would have discovered that Jones was forced to resign his position with Ford when they discovered him carrying out certain fraudulent practices against the company. Had Norris' inquiry gone further, he also would have discovered that Jones had carried out fraudulent schemes against the First Alabama Bank of Dothan. It was admitted that had Norris or Stewart possessed this information, Jones would not have been hired. Nonetheless, on May 15, 1978, Jones was hired to serve in a position of trust with Commercial.

The second significant link in this chain of events has to do with Commercial's method of operation in its Montgomery office; in particular, the manner in which it stores and supervises its checks and check writing equipment. Both the checks and a mechanical check embossing machine were stored in an unlocked metal cabinet in an unoccupied storeroom.[3] It takes little imagination to guess what happened next. On June 28, 1978, some six weeks after coming to work for Commercial, Jones went into the storeroom, took check no. 134–5898, and used the embossing machine to print in the amount of $45,500. After everyone left that day, Jones, completed the stolen check by making it payable to Jones Farms and forging the signatures of Commercial's authorized agents, Norris and Stewart.

The following day Jones negotiated the forged check to the Union Bank and Trust Company of Montgomery. He received three cashiers checks: the first payable to himself for $10,359; the second payable to the First Alabama Bank of Dothan for $30,000; and the third payable to the Union Bank for $5,140.95. The Union Bank then negotiated the forged check to First Alabama Bank of Montgomery which paid it on June 30, 1978.

Joan Hill, Commercial's clerk who had primary check writing responsibility, discovered the stolen check missing on July 5, 1978. She informed Commercial's home office in Maryland and was told to attach an explanatory notation to her daily Branch Cash Report. Though she testified such notation was made, it was never produced at trial. Both Joan Hill and Norris believed that a stop payment order was sent to the bank on the day the check was discovered missing. The bank never received that order. There are two possible explanations: the first is that Hill's and Norris' general recollection that it was sent was in fact erroneous, and the second is that the person asked to deliver the order to the Bank, none other than Jones himself, elected not to do so.

Commercial first became aware of the forgery on October 20, 1978,[4] and informed the Bank of that fact, by letter, that day. Upon acknowledging receipt of the forged check on October 31, 1978, the Bank credited Commercial's account in the amount of $45,500. On December 27, 1978, having concluded to its satisfaction that the forgery was caused by Commercial's own negligence, and upon advice of counsel, the

3. The check embossing machine printed the amount of the check only, it did not duplicate the authorized signatures necessary to complete the instrument.

4. Jones was asked to resign three days later.

Bank informed Commercial that it was putting a hold on Commercial's account in the amount of the potential loss. Suit was filed by Commercial to have the hold removed some eleven weeks later. From a judgment for Commercial, the Bank appeals.

As a preliminary matter we note that, since this Court's jurisdiction is based on diversity of citizenship, we are bound to apply the law of the jurisdiction in which the District Court hearing the case is located. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1978). In this case, Alabama law is binding on us. We also note that this case was tried without a jury, strictly on stipulated facts, affidavits, and depositions. Though we are still governed by the clearly erroneous standard of review, with respect to factual findings of the District Court, Fed.Rules Civ.Proc. Rule 52(a), the appellant's burden of showing clear error is not as heavy as it would be had the District Court's determination involved the assessment of the credibility of witnesses by way of personal observation. *Marcum v. United States,* 621 F.2d 142, 145 (5th Cir. 1980).

The only issue presented on appeal is whether the trial court erroneously rejected the defense offered by the Bank, set forth in Alabama Code § 7–3–406. That section provides the following:

> Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

The trial court ruled that the interpretation of that section was governed by *East Gadsden Bank v. First City National Bank of Gadsden,* 50 Ala.App. 576, 281 So.2d 431 (1973). The court also held that, applying *East Gadsden,* the Bank had failed to establish either the requisite degree of negligence or the causal relationship between

such negligence and the payor bank's *acceptance* of the check in question necessary to invoke the Section 7–3–406 defense. Though we agree with the trial court that *East Gadsden* is controlling, we disagree with its interpretation and application of that case.

In *East Gadsden,* plaintiff, payor bank, sued defendant, collecting bank, on the latter's guarantees of endorsement on a check which later was discovered to bear a forged endorsement. As one of its defenses to payment on the check, collecting bank asserted Section 7–3–406, arguing that the negligence of the drawer of the check substantially contributed to its *making* and, therefore, liability should be placed on said drawer. The Alabama Court of Appeals held Section 7–3–406 inapplicable to those facts on the grounds that (1) the actions of the drawer were not negligent and (2) to the extent that negligence existed, it bore no causal relationship to the collecting bank's *acceptance* of the check.

The conduct of the drawer found to be non-negligent involved its acceptance from the forger of a loan application which was accompanied by a buyer's order, for an automobile, bearing the forged signature of the purported seller. The court said that, while the drawer's failure to verify the order with the selling company may have been a poor practice, "[m]ere laxity in the conduct of the business affairs of the drawer is not such negligence as to preclude or estop him from recovery against the drawee bank for the amount charged against his account as a consequence of the bank's payment of a check bearing a forged endorsement." 281 So.2d at 436.

The Alabama court also thought that, to the extent the drawer's issuance of check on a forged purchase order may have been negligent, "[s]uch act of the drawer was not the proximate cause of the acceptance of the forged endorsement." 281 So.2d at 436. By so holding, the Alabama Court of Civil Appeals interpreted the language of Alabama Code § 7–3–406 to mean that the drawer's negligence in *making* or contributing to the *making* of a negotiable instru-

ment does not bar the drawer from recovering against the payor of such instrument when the drawer's negligence did not substantially contribute to the payor's *acceptance* of the instrument. Contrary to our appellant's contention, the Alabama Court did not erroneously construe the statutory language of "negligence substantially contributes ... to the making." to mean negligence substantially contributing to the acceptance. The court simply held the fundamental principles of tort law to be applicable; that is that a negligent act does not in itself give rise to a right of recovery, unless it can be shown that such act *caused* the injury complained of. We think such interpretation of Section 7–3–406 is wholly reasonable. We also think it is clear that, in *East Gadsden*, the payor bank accepted the check because of its negligence in failing to detect the forged *endorsement*, not because the drawer drafted the check initially. As drafted, the instrument was valid and negotiable. The check was drawn payable to both the automobile dealer and forger. The forger presented the instrument with a forged *endorsement* in the name of the automobile dealer.

■ *East Gadsden* establishes three criteria which must be established by a payor seeking to invoke Section 7–3–406 as a defense against a drawer's suit to force the payor to assume liability for an altered or unauthorized instrument. They are the following: the payor must have paid the instrument in good faith and in accordance with reasonable commercial standards; the drawer must have acted negligently so as to contribute to the *making* of the alteration or unauthorized signature; and the drawer's negligent acts must be the proximate

cause of the payor's *acceptance* of the instrument.[5]

■ In the present case it is undisputed that the Bank acted in good faith and that its normal practice of verifying the authenticity of signatures and endorsements is commercially reasonable. There is no evidence as to the processing of the specific check in question. The trial court did not deal with this point because it concluded that the Bank had failed to establish Commercial's negligence. Commercial offered no evidence to indicate that the Bank failed to follow its standard practice with respect to the negotiation of the check. Moreover, the Bank was prevented from producing direct evidence on that point as a result of Commercial's failure to notify the Bank of the forgery within a reasonable time thereafter. The Bank keeps records for ninety days of which employee verified the authenticity of signatures and endorsements on every check. After that time they are destroyed. This is a commercially reasonable practice. The check was negotiated on June 29, 1978. Commercial received it as part of its normal monthly statement on or about July 7, 1978. The Bank was not notified by Commercial of the forgery until October 20, 1978. By that time, the record that would have indicated which employee handled the check had been destroyed. We conclude that the Bank must be presumed to have followed its standard practice, absent evidence by Commercial to the contrary, particularly in view of the fact that Commercial's slowness in discovering the fraudulent check and giving notice prevented the presentation of the only evidence that existed. We are not willing to indulge in the presumption that the fact of negotia-

**5.** Both parties make much ado about the extent to which *East Gadsden* interprets Section 7–3–406 in a manner consistent with the interpretation the same provision has received in other jurisdictions. The Bank has provided this Court with citations from numerous jurisdictions, for the purpose of establishing that Alabama's interpretation is erroneous. We think it important to point out that such argument is meritless. Though uniformity in the interpretation and application of the Uniform Commercial Code may be desirable, it is not this Court's

function to work toward such goal. The Courts of Alabama are free to construe their own law as they see fit. Had the Courts of Alabama not considered the question, the law of other jurisdictions might be instructional. Since they have done so in this case, we are bound to follow their direction. Additionally, we would point out that the interpretation given Section 7–3–406 in *East Gadsden* is not significantly different than that adopted in many other jurisdictions. *See* Annot., 67 ALR 3d 144 (1975).

tion established failure to follow reasonable practices. To take such a position would render Section 7–3–406 meaningless. Though the burden would ordinarily be on the Bank to prove its adherence to its standard practice we believe the earlier recited facts warrant a somewhat different allocation of the burden in this case.

■ The next issue is whether Commercial committed acts of negligence that substantially contributed to the making of an unauthorized signature or the material alteration of the instrument in question. The District Court held that Commercial had not committed such negligent acts. The Bank asserts error in the District Court's failure to find negligence in Commercial's hiring of Jones and in Commercial's failure to adequately safeguard its checks and embossing equipment from being misused by him. We hold that those acts, when considered collectively, constituted clear negligence as a matter of law. Accordingly, we hold the District Court's determination to be clearly erroneous.

We disagree with the trial court's characterization of the facts as being similar to the "merely lax business practices" discussed in *East Gadsden*. Commercial hired a person who would have been uncovered as a known defrauder had anything greater than a perfunctory inquiry to verify prior employment been made. Commercial admits they did not follow their own standard investigatory procedure for hiring new employees. Commercial further admits that had they had the knowledge that such investigation would doubtlessly have uncovered, Jones would never have been hired. To hire such an individual, without any meaningful inquiry, into a position in which his activities would be closely supervised, may be a lax business practice. To do the same, and place the person in a position of trust in which he is required to handle significant sums of money, and fail to provide any supervision, goes well beyond lax business practices. To compound the situation by giving the employee ready access to the company's checks and check embossing equipment is to ask for precisely the type of

result that occurred. This is not to suggest that failure to keep the checks and embosser absolutely secure from all employees at all times constitutes negligence. The realities of day-to-day business operations obviously dictate otherwise. On the other hand, there must be some point at which a company's failure to monitor its employees and its financial records becomes both irresponsible and negligent. We believe the present situation goes well beyond that point. This is not like *East Gadsden*, in which the drawer was simply mislead. In this case, Commercial was an active participant in the activities that resulted in the forgery. As a direct result of Commercial's negligence, Jones was put in the position in which he had ready access to the company's checks and check embosser. It is difficult to imagine how Commercial could have more substantially contributed to the alteration of the check or the making of the forged signatures than it did, without being a party to the forgery.

■ The final question is whether Commercial's negligence in contributing to the making of the forged instrument was the proximate cause of the Bank's acceptance of the check. The District Court, having concluded that Commercial was not negligent, did not reach the issue. For the reasons set out below, we hold that Commercial's negligence was the proximate cause of the Bank's acceptance of the check.

Commercial contends that *East Gadsden* requires that the question of proximate cause be resolved in its favor. We disagree, because we think that case is factually distinct from the one at bar. In *East Gadsden*, the payor was presented with a valid check bearing a false endorsement. The negligence, if any, was in drafting a valid check without first authenticating the purchase order to which it was to be applied. The negligence of the drawer in no way enhanced the negotiability of the instrument nor contributed to its acceptance by the payor. Quite simply, the payor accepted the check because it failed to detect the forged *endorsement,* not because the drawer negligently issued it. In the present

case, the question is not one of a forged endorsement. The instrument itself was invalid. It appeared to be valid and authentic, however, as a direct result of Commercial's negligence. Moreover, it was this apparent authenticity that substantially contributed to the Bank's negotiation of the check. Clearly, Commercial's negligence proximately caused the Bank to accept the invalid instrument.

We conclude that the Bank has proven all the elements necessary to set-up the Section 7–3–406 defense to Commercial's suit to have the hold removed from its account. The Bank was entitled to recoup from Commercial the amount it lost when it negotiated Jones' check. Accordingly, the judgment of the District Court for Commercial is REVERSED and the case is REMANDED with instructions to enter judgment consistent with this opinion for appellant Bank.