ON APPLICATION FOR REHEARING
The opinion originally issued in this case is withdrawn and the following is substituted in its place.
This appeal principally involves the liability of a depositary bank for accepting, over a forged indorsement, a check payable to a corporate payee for deposit into an individual's account, without inquiring as to the authority and reason for such a deposit. The appeal is from a judgment as to two cross-claim defendants. The original claim and other cross-claims are not at issue here, but it will be necessary to set them out to convey an understanding of the case.
Harry L. Severson brought an action against Ken Stanton, alleging that Stanton had, by fraud and undue influence, obtained his signature, or forged his signature, to three checks totalling $62,314 drawn on his savings account at SouthTrust Bank of Mobile ("SouthTrust"). Severson amended his complaint, adding Al Sarena Mines, Inc. ("Al Sarena") and Merrill Lynch, Pierce, Fenner Smith ("Merrill Lynch") as defendants. Severson alleged that one of the checks fraudulently obtained by Stanton from him was deposited into a Merrill Lynch account maintained by Al Sarena. The trial court granted a preliminary injunction freezing Severson's funds, totalling $27,314, that had been deposited into Al Sarena's account at Merrill Lynch.
With its answer to Severson's complaint, Al Sarena filed cross-claims against Stanton and Merrill Lynch, alleging that Stanton had forged Al Sarena's indorsement on some checks issued by Merrill Lynch and made payable to Al Sarena. Severson amended his complaint again to add SouthTrust as a defendant, alleging that SouthTrust had breached its contract by honoring the three checks drawn on his account that allegedly bore the forged signature of Severson. Al Sarena amended to add a cross-claim against SouthTrust alleging conversion of checks made payable to Al Sarena and bearing forged indorsements purporting to be Al Sarena's.
The case was tried before a jury. At the close of the evidence, the trial court granted Merrill Lynch's motion for directed verdict as to Al Sarena's cross-claim against it, on the grounds that Al Sarena was a non-qualified foreign corporation doing business in Alabama.
The case then went to the jury, which rendered a verdict in favor of Severson as to the $27,314, which Merrill Lynch had paid into the court. The jury also rendered a verdict in favor of Al Sarena for $1,000, the amount of the first check paid over Stanton's forged indorsement, on its cross-claim against SouthTrust. The trial court entered judgment on the verdict. Al Sarena filed a motion for judgment notwithstanding the verdict or, in the alternative, for new trial on its cross-claims against SouthTrust and Merrill Lynch. The trial court denied those motions, and Al Sarena appeals.
In 1980, Charles McDonald and Dr. Herbert McDonald opened an investment account with Merrill Lynch for Al Sarena, an Oregon corporation of which they were the principal officers and shareholders. Al Sarena was at all times material to this case an inactive mining corporation, its assets consisting essentially of the cash deposited in the Merrill Lynch account in 1980. The McDonalds handled Al Sarena's affairs from an office over a garage behind their residence in Mobile. At the time the account was opened with Merrill Lynch, the McDonalds instructed Merrill Lynch to reinvest all earnings or dividends in other securities. Only the McDonalds had signature authority on the account.
In the early 1980's, the McDonalds engaged Stanton to handle the accounting *Page 1358 
affairs relating to Al Sarena. At first, Stanton's job consisted of preparing tax returns. Later, he began doing essentially all of the bookkeeping for Al Sarena, including the review and reconciliation of the monthly statements received from Merrill Lynch and from an Oregon bank where Al Sarena's checking account was held.
In April 1983, Stanton began taking advantage of his responsibilities by requesting checks payable to Al Sarena from the Merrill Lynch account, forging Al Sarena's indorsement in blank on the checks, indorsing the checks in his name, and depositing them into his personal checking account with SouthTrust. He also deposited some of the checks into a corporate account that he had established in the name of Tab Sales of Alabama/Mississippi, Inc., a corporation of which he was the principal shareholder. This conduct continued until September 1985 and involved 23 checks totalling $58,424.
The issues raised on appeal concern only Al Sarena, SouthTrust, and Merrill Lynch. Al Sarena argues that SouthTrust is liable for the face amount of the checks paid on forged indorsements, less reimbursements made to Al Sarena.
Ala. Code (1975), § 7-3-419, reads, in pertinent part:
"(1) An instrument is converted when:
. . .
". . . .
"(c) It is paid over a forged indorsement.
 "(2) In an action against a drawee under subsection (1) the measure of the drawee's liability is the face amount of the instrument. In any other action under subsection (1) the measure of liability is presumed to be the face amount of the instrument.
 "(3) Subject to the provisions of this title concerning restrictive indorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands."
There is no dispute that the indorsements of Al Sarena on the checks were forged. The parties tried the case under the theory that § 7-3-419(1)(c) governs these facts. It does not, however, because SouthTrust did not "pay" the check within the meaning of the commercial code. See Strickland v. Kafko Mfg., Inc.,512 So.2d 714 (Ala. 1987); 6 R. Anderson, Uniform Commercial Code, § 3-419.5 (3d ed. 1984). However, it is true that Al Sarena has a cause of action against SouthTrust for conversion. "The payee may bring a conversion action against the depositary bank in which the forger has his own account in which he deposited the check after forging the payee's name." Id., § 3-419.57 (citations omitted). Such a conversion action lies under the common law through the commercial code's retention of principles of law not specifically displaced. Ala. Code 1975, §7-1-103; Strickland, supra; 1 R. Anderson, supra, § 1-103.25 (3d ed. 1981). Therefore, absent a legitimate defense, SouthTrust is liable for paying the checks over the forged indorsements.
SouthTrust's asserted defenses hinge upon the question of whether it acted in a commercially reasonable manner in accepting the checks payable to Al Sarena for deposit into Stanton's personal account or into the Tab Sales account. This element of commercial reasonableness appears not only in §7-3-419(3), quoted above, but also in § 7-3-406, which reads:
 "Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business." *Page 1359 
See J. Gordon Neely Enterprises, Inc. v. American National Bankof Huntsville, 403 So.2d 887 (Ala. 1981).
In argument to the trial court as to how the jury should be charged, Al Sarena contended that, unless SouthTrust acted reasonably, it could not assert the defense that Al Sarena, through its negligence, substantially contributed to the forgeries and thus is liable for the face amount of the checks deposited with Stanton's forged indorsements.
We note that there is some question as to whether the last clause of § 7-3-406, beginning with "or against a drawee or other payor," applies to SouthTrust at all. SouthTrust is not a "payor bank" as defined in § 7-4-105(b), nor is it a drawee. Although "drawee" is not defined in the commercial code, the drawee is the bank where the account on which the check is drawn is maintained. See, e.g., §§ 7-4-105(b); 7-3-409(1);7-3-410(1); 7-3-502(1)(b). There is some authority, however, for the proposition that the term "payor" in § 7-3-406 is broader than the term "payor bank." For example, the official comments to that section include the statement, in comment 2, that "The section extends the above principle to the protection [of] a holder in due course and of payors who may not technically be drawees." See also 6 R. Anderson, UniformCommercial Code, § 3-406:19 (3d ed. 1984); East Gadsden Bank v.First City Nat. Bank of Gadsden, 50 Ala. App. 576, 281 So.2d 431
(1973).
Of course, if SouthTrust is not a "payor" within the meaning of § 7-3-406, it would have to prove itself to be a holder in due course in order to avail itself of the defense of §7-3-406. In that case, the requirement that it took the checks "[w]ithout notice . . . of any defense against" them, §7-3-302(1)(c), would entail an analysis very similar to that below, in which we discuss the question of whether acceptance of a check to a corporate payee for deposit into a personal account without inquiry is commercially unreasonable as a matter or law. Because the parties tried the case under the theory that SouthTrust is a "payor" and thus entitled to a §7-3-406 defense only if it acted in accordance with commercially reasonable standards, we shall treat that theory as the law of the case. We note that many of the cases discussed below accept without question the premise that a defendant depositary or collecting bank is a "payor" within the meaning of U.C.C. § 3-406.
Two questions are presented as the case is postured: Was SouthTrust's treatment of the checks commercially unreasonable as a matter of law, entitling Al Sarena to a directed verdict for the face amount of the checks? If not, did the § 7-3-406
defense fail only as to the checks presented before Al Sarena had a reasonable opportunity to discover and report the forgeries?
Al Sarena moved for a directed verdict against SouthTrust for the amount of the checks cashed over forged indorsements. The trial court denied that motion. Al Sarena then requested the court to instruct the jury that commercial unreasonableness would completely prevent SouthTrust from asserting Al Sarena's negligence as a defense to the conversion claim. The court disagreed:
 "Mr. Watts [for Al Sarena]: My only point is, if the bank doesn't pay those checks in accordance with reasonable commercial standards, the negligence of Al Sarena Mines is not only a limited defense, it's no defense at all.
"The Court: I don't buy that.
 "Mr. Watts: That's what the Code says. In other words, they've got to first meet their burden on that issue before the negligence of Al Sarena Mines [sic]."
The court later confirmed its ruling, expressing the opinion that "SouthTrust would not be liable for that period of time after [Al Sarena] reasonably could have" discovered the forgeries.
As a result of the charging conference, the attorney for SouthTrust drafted the following charge, which the trial court read to the jury:
 "I charge you ladies and gentlemen of the jury that if you are reasonably satisfied from the evidence that Al Sarena *Page 1360 
Mines was negligent in failing to discover within a reasonable period of time after its receipt of statements from Merrill Lynch that checks were being issued on its account that were unauthorized and that their negligence proximately caused or contributed to SouthTrust's continuing to accept said checks for deposit and if you are further reasonably satisfied from all the evidence SouthTrust acted within reasonable commercial standards in accepting the checks then you cannot return a verdict against SouthTrust with respect to the checks presented after the reasonable period of discovery expired."
Upon initial consideration of this cause, we concluded that this charge raised a defense based on § 7-4-406, and held that, because Al Sarena did not object to the charge, it could not raise any error regarding the issues charged therein. Upon closer inspection of the transcript of the charge conference, and upon consideration of the argument in the brief on application for rehearing, we realize that this is the very charge that SouthTrust's attorney drafted pursuant to the trial court's rulings on the applicability of § 7-3-406, and that Al Sarena's attorney explicitly took issue with those rulings. It is simply coincidental that the facts constituting the alleged negligence are similar to the defense of § 7-4-406, with the crucial differences that Al Sarena is not SouthTrust's customer and SouthTrust did not send any statements to Al Sarena, so that § 7-4-406 is not in fact applicable.
The "reasonable time" element of the above-quoted charge is appropriate to § 7-4-406, with its requirements that the bank's customer examine statements with "promptness" and notify the bank "promptly" after discovery of any unauthorized signatures or alterations, and that, if the customer fails to comply with those duties,
 "the customer is precluded from asserting against the bank . . . (b) An unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement [were] available to the customer for a reasonable period not exceeding 14 calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration."
There is no such requirement in the terms of § 7-3-406, however. Even in § 7-4-406, the bank's defense of failure to notify within a reasonable time is not available if the bank does not exercise ordinary care: "(3) The preclusion under subsection (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item(s)."
The above discussion establishes only that if SouthTrust failed, as a matter of fact or law, to follow commercially reasonable standards, § 7-3-406 does not provide a basis for SouthTrust to raise Al Sarena's negligence as a defense. In fact, the instruction quoted above correctly informed the jury that if it found that Al Sarena was negligent, and that such negligence proximately contributed to SouthTrust's continuing to accept the forged checks, and that SouthTrust acted within reasonable commercial standards, then it could not return a verdict against SouthTrust on the checks presented after the reasonable period of discovery expired. Thus, the verdict, disallowing recovery for checks presented after Al Sarena reasonably could have discovered Stanton's misappropriation, implicitly includes a finding that SouthTrust acted within reasonable commercial standards.
Therefore, we must address Al Sarena's argument that SouthTrust's handling of the checks constituted, as a matter of law, a failure to follow reasonable commercial standards. After a thorough review of the cases on the subject, we conclude that it did.
A succinct and accurate statement of the rule is found inAetna Cas. Sur. Co. v. Hepler State Bank, 6 Kan. App. 2d 543,630 P.2d 721, 728 (1981):
 "Barring exceptional circumstances, the general rule is that failure of a bank to inquire when an individual cashes a check made payable to a corporate payee and puts the money in his personal account *Page 1361 
is an unreasonable commercial banking practice as a matter of law."
(Citations omitted.)
The earliest case adopting this rule in applying either § 3-406 or § 3-419(3) of the U.C.C. appears to be Gresham StateBank v. O K Constr. Co., 231 Or. 106, 370 P.2d 726, clarified on other points and rehearing denied, 231 Or. 106, 372 P.2d 187
(1962). The court held that the corporate payee was not precluded from recovering upon the forged checks even though it was negligent in allowing the forgeries to continue for three years. The opinion included the following rationale:
 "In the ordinary case it seems proper that the negligent payor, rather than the negligent principal, should bear the loss caused by an agent's unauthorized endorsement of his principal's check. An important factor supporting this conclusion is the relative ease with which the payor, having knowledge of the agency, can ascertain the agent's authority, as compared with the difficulty with which an employee's dishonesty may be detected by his employer. The employer must overcome the obstacles which the employee devises for the very purpose of making it difficult to detect the defalcations. Certainly under the circumstances of the present case, it was more reasonable for the officers of the O and K Construction Company to assume that their employee was honest than it was for [the store owner who cashed the checks] to assume that [the employee] had the authority to endorse checks and receive payment in cash for no ostensible corporate purpose."
Id., 231 Or. at 125, 370 P.2d at 735 (citations omitted).
The U.C.C. itself provides a convincing basis for making the issue one of law in § 3-304(2), enacted as Ala. Code 1975, §7-3-304(2):
 "The purchaser has notice of a claim against the instrument when he has knowledge that a fiduciary has negotiated the instrument in payment of or as security for his own debt or in any transaction for his own benefit or otherwise in breach of duty."
Anderson says, "This concept applies not only to the 'formal' fiduciary, such as a trustee, but also to any person holding or standing in a position of trust, such as an agent or employee." 5 R. Anderson, op. cit. § 3-304:29 (3d ed. 1984) (citations omitted). Some of the cases cited below, such as Von Gohren andSwiss Baco, rely in part on this provision to show that if a bank allows a corporation's employee to deposit a corporate check into his own account the bank has notice of a claim and thus has not acted in accordance with reasonable commercial standards. Under such an analysis, SouthTrust had notice of Al Sarena's claim against the checks and did not follow commercially reasonable standards in allowing Stanton to negotiate them for his own benefit.
The following cases have also held that the defendant (in most cases, a bank) was precluded from asserting the corporate payee's negligence because the defendant had failed, as a matter of law, to follow the reasonable commercial standards of its business in accepting checks for cash or deposit without inquiring of the corporation: Belmar Trucking Corp. v. AmericanTrust Co., 65 Misc.2d 31, 316 N.Y.S.2d 247 Civ.Ct. (1970); VonGohren v. Pacific Nat'l Bank of Washington, 8 Wn. App. 245,505 P.2d 467 (1973); Swiss Baco Skyline Logging, Inc. v.Haliewicz, 18 Wn. App. 21, 567 P.2d 1141 (1977) (relying onVon Gohren); National Bank of Georgia v. RefrigeratedTransport Co., 147 Ga. App. 240, 248 S.E.2d 496 (1978) (but seeTrust Co. v. Port Terminal, infra); Sherriff-Goslin Company v.Cawood, 91 Mich. App. 204, 283 N.W.2d 691 (1979); Pargas, Inc.v. Estate of Taylor, 416 So.2d 1358 (La.App. 1982); AmericanMachine Tool Distrib. Ass'n v. National Permanent Federal Sav. Loan Ass'n, 464 A.2d 907 (D.C.App. 1983); Confederate Welding Safety Supply, Inc. v. Bank of the MidSouth, 458 So.2d 1370
(La.App. 1984); D G Equipment Co. v. First Nat'l Bank ofGreencastle, Pa., 764 F.2d 950 (3d Cir. 1985) (applying Pennsylvania law); Lincoln Nat'l Bank Trust Co. v. Bank of *Page 1362 Commerce, 764 F.2d 392 (5th Cir. 1985) (applying Louisiana law); Central, Inc. v. Cache National Bank, 748 P.2d 351
(Colo.App. 1987).
The following cases are generally consistent with those above, although not squarely on point: East Gadsden Bank v.First City Nat'l Bank of Gadsden, 50 Ala. App. 576,281 So.2d 431 (1973) (check payable jointly to individual and automobile dealership, dealership's signature forged; defendant collecting bank did not aver that it accepted the check in accordance with reasonable commercial standards); Tubin v. Rabin, 389 F. Supp. 787
(N.D.Tex. 1974), aff'd, 533 F.2d 255 (5th Cir. 1976) (failure to authenticate endorsement of copayee); Empire Moving Warehouse Corp. v. Hyde Park Bank Trust Co., 43 Ill. App.3d 991, 2 Ill.Dec. 753, 357 N.E.2d 1196 (1976) (summary judgment for corporate payee proper because bank did not raise a fact issue as to its reasonableness); First City National Bank ofMidland v. Federal Deposit Ins. Corp., 782 F.2d 1344 (5th Cir. 1986) (applying Texas law; defense not available because no evidence presented that bank acted in accord with reasonable commercial standards). See also Peoples Life Ins. Co. of SouthCarolina v. Community Bank, 278 S.C. 70, 292 S.E.2d 188 (1982);Matco Tools Corp. v. Pontiac State Bank, 614 F. Supp. 1059
(E.D.Mich. 1985); Walters v. Alden State Bank, 155 Mich. App. 29, 399 N.W.2d 432 (1986); Mohr v. State Bank of Stanley,241 Kan. 42, 734 P.2d 1071 (1987); Lund's, Inc. v. Chemical Bank,870 F.2d 840 (2d Cir. 1989).
The following cases, cited by SouthTrust, are not persuasive on the specific question before us, because they do not involve a diversion of a check made out to a corporate payee; they apply the more general proposition that commercial reasonableness is ordinarily a question of fact: CommercialCredit Equip. Corp. v. First Alabama Bank of Montgomery, N.A.,636 F.2d 1051 (5th Cir. 1981); Terry v. Puget Sound NationalBank, 80 Wn.2d 157, 492 P.2d 534 (1972); Transamerica Ins.Co. v. United States Nat'l Bank of Oregon, 276 Or. 945,558 P.2d 328 (1976); Parsons Travel, Inc. v. Hoag, 18 Wn. App. 588, 570 P.2d 445 (1977); Jacoby Transport Systems, Inc. v.Continental Bank, 277 Pa. Super. 440, 419 A.2d 1227 (1980); Cookv. Great Western Bank Trust Co., 141 Ariz. 80, 685 P.2d 145
(App. 1984). See also J. Gordon Neely Enterprises, Inc. v.American National Bank of Huntsville, 403 So.2d 887 (Ala. 1981) (checks made payable to forging employee's bank).
Thus, the only case disclosed by the parties or our research that is even arguably inconsistent with the rule quoted above from Aetna is Trust Co. of Georgia Bank of Savannah, N.A. v.Port Terminal Warehousing Co., 153 Ga. App. 735,266 S.E.2d 254 (1980). The Georgia Court of Appeals in that case reversed a summary judgment for the plaintiff, holding that, "On the evidence before us, Port Terminal has not shown the bank's commercial unreasonableness so as to estop this defense and is not entitled to judgment as a matter of law."153 Ga. App. at 742, 266 S.E.2d at 259. The court distinguished its earlier case, National Bank of Ga. v. Refrigerated Transport Co.,supra:
 "Port Terminal and the trial court interpreted our decision in NBG as standing for the proposition that it is commercially unreasonable as a matter of law for a bank to credit its customer's account with the proceeds of a third party check without first inquiring into the validity of the endorsements. We believe this is a misinterpretation of NBG.
 ". . . The holding in NBG is that the bank had failed to produce evidence which would support the jury's finding that it had acted with commercial reasonableness. This is, in our opinion, far different from holding that mere evidence of the failure to inquire into the validity of the endorsements on third party checks without more meets Port Terminal's burden on summary judgment of showing such commercial unreasonableness as to estop the bank from asserting in its defense the possible negligence of Port Terminal in the forgeries. Reasonable commercial standards and whether those standards have been met under the circumstances are, in the first instance, *Page 1363 
questions of fact. Parsons Travel, Inc. v. Hoag, 18 Wn. App. 588, 570 P.2d 445 (1977). We decline to adopt a rule which would make the mere failure to check the validity of ostensibly valid endorsements on third party checks commercially unreasonable as a matter of law."
153 Ga. App. at 739-40, 266 S.E.2d at 258. We note that the court in National Bank of Georgia, supra, in adopting the trial court's order, included the following: "Therefore, failure to inquire into the validity of the indorsements in question precluded NBG from asserting the defense of commercial reasonableness of Ga. Code § 109A-3-419(3) as a matter of law."147 Ga. App. at 245, 248 S.E.2d at 500 (emphasis added).
The decision in Port Terminal is readily distinguishable on the grounds (1) that the court stated and applied a more general test, regarding "the failure to check the validity of ostensibly valid endorsements on third party checks," rather than the specific test of failure to inquire when accepting checks to corporate payees other than for deposit into the corporate account; (2) that the court relied on cases applying the general rule to inapposite fact situations, such as ParsonsTravel and Transamerica, both supra; and (3) that especially bad facts made the corporate payee rule inequitable without the proviso of "barring exceptional circumstances."
The facts in Port Terminal truly did constitute exceptional circumstances: Port Terminal rehired an employee who had been fired for earlier embezzlement of Port Terminal's checks, put her back in a position where she had access to checks payable to the corporation, and instituted no procedures whereby it could have discovered her diversion of checks. If the court inPort Terminal had applied the specific rule concerning corporate checks, including the "barring exceptional circumstances" proviso stated in some of the cases, it could have reached the result it did without being inconsistent with all the other case law on the subject, including its own earlier National Bank of Georgia case.
Nothing in the facts of this case presents the exceptional circumstances necessary to obviate the requirement of commercial reasonableness as a prerequisite to SouthTrust's raising Al Sarena's negligence as a defense. SouthTrust relies on the fact that the McDonalds did not immediately remove Stanton from his responsibilities when they discovered the diversion of the Merrill Lynch funds. The evidence indicated, however, that Stanton's last diversion of a Merrill Lynch check occurred before that discovery, so this case does not present the Port Terminal circumstance of forgeries resulting from an employer's allowing a known embezzler to have access to checks payable to the company. SouthTrust also argues that the McDonalds, having known Stanton most of his life, must have known that he was tried for embezzlement in 1967 and 1968. The only evidence on this point, however, came from Charles McDonald, who answered a question premised on the fact that Stanton had been tried by denying knowledge of the trials and saying that he was not in touch with Stanton during that period.
Neither is the McDonalds' failure to discover Stanton's embezzlements for more than two years such an exceptional circumstance; it is the very negligence that would constitute a defense if SouthTrust had been commercially reasonable. Several of the cases cited above involve failure of discovery for similarly long periods: e.g., Gresham, three years; VonGohren, 14 or 15 months; Pargas, more than three years;American Machine, four and one-half years; Lincoln National, seven years. At some point, a corporation's failure to discover its bookkeeper's embezzlements might create an exceptional circumstance estopping it from asserting forgeries against a bank that had failed to follow commercially reasonable standards, but that point has not been reached here. To hold that it had would eliminate the commercial reasonableness element of the defense, allowing the bank to assert the plaintiff's negligence as an exceptional circumstance.
Incidentally, even if we did not rule that SouthTrust's conduct was commercially unreasonable *Page 1364 
as a matter of law, Al Sarena would be entitled to a directed verdict, because the evidence was undisputed that such handling of corporate checks was not in accordance with reasonable commercial banking standards. John Martin, the Merrill Lynch account executive who handled the account, testified that he knew the banking practices regarding accepting checks payable to a corporation for deposit into an account other than the payee's, and that those practices required the bank to have a corporate authorization executed by the proper officers of the corporation. SouthTrust's own "Operational Policy and Procedure Manual" was introduced, and it states: "Do not accept checks payable to a company for deposit to a personal account. Refer any such items to an officer of the bank." No such referrals to officers were made when Stanton presented any of the checks. Thus, the undisputed evidence was that SouthTrust's acceptance of the checks by the manner in which it accepted them was not in accordance with reasonable commercial standards.
The judgment of the trial court on Al Sarena's cross-claim against SouthTrust is reversed, and the cause is remanded for appropriate proceedings to determine the amount of damages due to Al Sarena from SouthTrust.
Al Sarena next argues that the trial court erred in directing a verdict for Merrill Lynch on the grounds that its claims against Merrill Lynch were barred by Ala. Code (1975), § 10-2A-247.
Section 10-2A-247 reads, in part:
 "(a) All contracts or agreements made or entered into in this state by foreign corporations which have not obtained a certificate of authority to transact business in this state shall be held void at the action of such foreign corporation or any person claiming through or under such foreign corporation by virtue of said void contract or agreement. . . ."
Al Sarena contends that § 10-2A-247 does not apply in this case because, it argues, it was not "doing business" in Alabama and therefore was not required to qualify pursuant to Section 232 of the Alabama Constitution. We disagree.
It is undisputed that the business arrangement between Al Sarena and Merrill Lynch was entered into in Alabama for maintenance of an account in Alabama. It is also undisputed that Al Sarena's only office is located in Alabama; that all of its officers are residents of Alabama; that it maintained its corporate books and records in Alabama; that it prepared all of its tax returns in Alabama; that Alabama was its business address; and that all of the services performed by Stanton were performed in Alabama. All of Al Sarena's business (except for a small checking account in an Oregon bank) was conducted in Alabama, including the establishment and maintenance of the account made the basis of this suit. In short, everything concerning the corporation, except its incorporation and the checking account in Oregon, was in Alabama. We hold that Al Sarena was "doing business" in Alabama as contemplated by § 10-2A-247.
It is clear that Al Sarena's contract action is barred by § 10-2A-247. See Freeman Webb Inv., Inc. v. Hale, 536 So.2d 30
(Ala. 1988). However, due to the penal nature of § 10-2A-247, its application has been limited to those cases in which the action is ex contractu as opposed to ex delicto.[1] Id. See alsoBoles v. Midland Guardian Co., 410 So.2d 82 (Ala.Civ.App. 1982).
Al Sarena contends that its actions are ex delicto and, therefore, are not barred by § 10-2A-247. In order to withstand the prohibition of § 10-2A-247, Al Sarena's tort actions must stand independently of the prohibited contract action. SeeFreeman Webb, supra. To determine whether Al Sarena's tort claims stand independently of the contract action, we must examine their substantive averments and the nature of the relief sought. Id. *Page 1365 
Al Sarena's tort claims merely seek to enforce those rights derived directly from its contract with Merrill Lynch. Because these actions simply complain of Merrill Lynch's failure to perform a contractual obligation, we must view them as ex contractu and, therefore, prohibited by § 10-2A-247. FreemanWebb, supra.
That portion of the judgment in favor of Merrill Lynch is affirmed; that portion in favor of SouthTrust is reversed; and the cause is remanded for further proceedings on Al Sarena's claim against SouthTrust.
APPLICATION GRANTED; ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY, C.J., and MADDOX, ADAMS and STEAGALL, JJ., concur.
[1] For this reason, this defense is not available to SouthTrust on Al Sarena's conversion claim against it.